# IN THE SUPREME COURT OF TEXAS

═══════════

No. 17-0151

═══════════

JBS CARRIERS, INC. AND JAMES LUNDRY, PETITIONERS,

v.

TRINETTE L. WASHINGTON, SOPHIA RENEE LENZY, THOMAS CHARLES LENZY,
INDIVIDUALLY AND AS REPRESENTATIVES OF THE ESTATE OF
MARY L. TURNER, DECEASED, RESPONDENTS

═══════════════════════════════════

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTH DISTRICT OF TEXAS

═══════════════════════════════════

**Argued September 19, 2018**

JUSTICE JOHNSON delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE GUZMAN, JUSTICE DEVINE, JUSTICE BROWN, and JUSTICE BLACKLOCK joined.

JUSTICE LEHRMANN and JUSTICE BOYD did not participate in the decision.

This case involves a pedestrian-truck collision that resulted in the pedestrian's death. The decedent's family contended that the truck driver was negligent in operating the truck and the driver's employer, the truck owner, was negligent in training the driver. The jury found that negligence of the driver, the truck owner-employer, and the decedent proximately caused the collision. The trial court rendered judgment on the verdict. The court of appeals affirmed.

The issues are (1) whether the trial court abused its discretion by excluding evidence of the pedestrian's mental illness and the fact that she had alcohol and drugs in her system at the time of the collision, and (2) whether the employer could be held directly liable for the death based on a negligent training theory.

We conclude that (1) the trial court erred by excluding the evidence, and (2) there is no evidence to support the finding that the alleged negligence of the employer in training the driver proximately caused the collision. We reverse and remand to the trial court for further proceedings.

## I. Background

On August 27, 2012, Mary Turner was on the south side of Rittiman Road in San Antonio, walking east on a sidewalk that paralleled Rittiman. Before reaching the corner where Rittiman intersects with Goldfield Street, Turner veered to her right, cutting the corner of Rittiman and Goldfield. She walked southeasterly across a parking lot and reached Goldfield south of its intersection with Rittiman. While Turner was walking across the parking lot toward Goldfield, James Lundry was driving a JBS Carriers, Inc. 18-wheeler tractor-trailer (truck) east on Rittman toward Goldfield. When Lundry reached the intersection of Rittiman and Goldfield he began a right turn to head south on Goldfield. As Lundry began the turn, a car traveling north on Goldfield toward Rittiman approached the intersection. Lundry was partially through the turn onto Goldfield when it became apparent that his truck and the car on Goldfield were blocking each other's progress and one or the other would have to back up.

Lundry testified that at this point the driver of the car was making hand signals toward Lundry, and that Lundry made his own hand signal toward the driver to indicate that the driver

2

needed to back up. The car backed up and created enough space for Lundry to complete the turn onto Goldfield. As Lundry was completing the turn, the truck's right front fender struck Turner, who by that time was crossing Goldfield approximately fifty-seven feet south of its intersection with Rittiman. Turner was knocked down and the tires of the trailer ran over her as Lundry proceeded down Goldfield. Lundry was unaware of Turner's presence or that she had been run over. He continued driving until a witness to the accident caught up with him and told him what had happened. Turner was pronounced dead at the scene. A security video camera from a nearby store recorded the events.

Turner's children, Trinette Washington, Sophia Lenzy, and Thomas Lenzy (collectively, the family), sued JBS and Lundry, asserting wrongful death and survival actions. The family alleged that Lundry, while acting in the course and scope of his employment with JBS, negligently operated the truck and that JBS was independently negligent for, among other things, failing to properly train Lundry.

The case was tried to a jury. JBS and Lundry sought to introduce evidence showing that Turner had mental health issues and before her death she had ingested substances that impaired her judgment. The proferred evidence included an autopsy, Turner's prior medical records, and testimony from an expert medical witness. The autopsy revealed that Turner had alcohol, cocaine, and oxycodone present in her body. Her personal effects included a "drug-type glass pipe," and her medical records noted a history of crack cocaine abuse. The medical records also revealed that months before the accident, Turner's doctor had prescribed medications to treat her for anxiety and recommended that she have a psychiatric evaluation, which she did shortly before her death. The

3

psychiatric evaluation resulted in Turner's being diagnosed with paranoid schizophrenia and bipolar disorder. She received a prescription for two additional medications to treat those conditions. Turner's daughter told the San Antonio police investigating the accident that Turner had mental health issues.

Dr. Keith Miller, a medical expert hired by JBS and Lundry, opined that the various substances in Turner's body impacted her cognition and that she was suffering from an acute exacerbation of her underlying mental disease at the time of the accident. Based on the autopsy, toxicology reports, and video of the occurrence, Dr. Miller testified during an offer of proof by JBS and Lundry that

> [i]t appeared to me that Ms. Turner walked in a steady pace without breaking stride, without speeding up or slowing down, walked right into the side of a tractor-trailer. Now, that's—that certainly to me in my experience—my education, training and experience, fits the scenario of a person who is not only impacted by medication but more likely is having an exacerbation of a severe mental condition particularly of the nature of schizophrenia paranoid type and bipolar disorder. We know that Ms. Turner was at least not taking some of her medications prescribed. Not taking the medication probably was a worse scenario for Ms. Turner than taking them; although, either could do that. And what I saw on the video, unfortunately, fits that situation.

The trial court excluded all evidence of Turner's mental health, prescription medications, and alcohol and drug use. The court agreed with JBS and Lundry that the autopsy and toxicology reports, Turner's daughter's statements to the police regarding Turner's mental health issues, and Dr. Miller's expert testimony were relevant to some extent. Nevertheless, the court concluded that "the prejudice outweighs, you know, what you want to put in so at this point I'm still going to sustain the objection by [the family] as to not going into those areas." *See* TEX. R. EVID. 403

4

(allowing a court to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice).

At trial, evidence was introduced regarding an area Lundry allegedly could not see from the cab of the truck—that is, a "blind spot"—located off the truck's right front fender. Evidence was also introduced regarding JBS's hiring, training, supervision, and maintenance programs, along with evidence that JBS's training manual did not mention that the truck's driver would have a blind spot in the area where Turner was when she and the truck collided. The family presented opinion testimony that the reason Turner entered the street when and where she did was because she mistook Lundry's gesture to the car's driver to be a signal by which Lundry was waiving her across the street. The family also presented evidence to support their position that Lundry did not see Turner because he was distracted by his interaction with the driver of the car at the intersection, not because the truck had a blind spot. A police detective who investigated the accident testified that in his opinion Turner was at fault in causing the accident because she failed to yield the right-of-way.

The jury found Lundry, JBS, and Turner negligent. It attributed 50% of the responsibility to Lundry, 30% to JBS, and 20% to Turner. The jury awarded damages for Turner's physical pain and mental anguish, funeral and burial expenses, and each child's loss of companionship and mental anguish.

Both parties appealed. 513 S.W.3d 703, 707 (Tex. App.—San Antonio 2017). In part, JBS challenged the legal and factual sufficiency of the evidence supporting the jury's separate finding of direct negligence on its part. Both JBS and Lundry challenged the trial court's excluding

5

evidence of Turner's mental health, the substances discovered in her body during the autopsy and their effects, and Dr. Miller's opinions. *Id.*

The court of appeals affirmed. *Id.* at 708–10. The panel was divided on the exclusion of evidence question, with the majority concluding that under Rule 403 the trial court did not abuse its discretion.[1] *Id.* at 714–15. After detailing the proffered testimony of Dr. Miller, the court addressed the evidence's probative value:

> Dr. Miller, a family physician, based his opinions on medical records made over two months before the accident. His trial testimony linking Turner's medical records to her specific state of mind on the day of the accident was weak, and in his deposition, he admitted he could not testify about Turner's state of mind on the day of the accident. Further, the security camera footage of the accident does not show Turner acting erratically. Therefore, we cannot say that the trial court abused its discretion in determining, pursuant to Rule 403, that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice in labeling Turner a bipolar schizophrenic drug addict.

*Id.* The dissenting justice disagreed, stating that "not only did the trial court abuse its discretion in excluding such evidence as more prejudicial than probative, . . . the excluded evidence was crucial to the issue of proportionate responsibility, resulting in the rendition of an improper judgment." *Id.* at 721 (Barnard, J., dissenting). She noted that the excluded evidence established that "Turner suffered from two serious mental health conditions . . . that could have affected her perceptions," which, if admitted, "would have provided an explanation as to why Turner chose to walk into a roadway—seemingly without stopping or looking—outside of the crosswalk." *Id.* at 723.

---

[1] JBS and Lundry also argued that the evidence was legally and factually insufficient to support the jury's award of wrongful-death damages to two of Turner's children. The court of appeals determined the evidence was sufficient to support the award. *Id.* The family brought a cross-appeal, alleging defects in the trial court's judgment. *Id.* The court of appeals agreed, remanding for the trial court to correct the errors. *Id.* Neither of the matters are presented in this appeal.

In this Court, JBS and Lundry bring two issues: (1) the trial court erred by excluding the evidence of mental health, alcohol use, and drug use; and (2) JBS was erroneously held directly liable to the family in addition to its respondeat superior liability for Lundry's actions. We address them in order.

## II. Exclusion of Evidence

JBS and Lundry argue that the evidence of Turner's mental health, prescription medication use, and drug and alcohol use was relevant to the issue of her negligence. Without this evidence, JBS and Lundry assert, they were effectively denied their primary defense because the case turns on the factual question of why Turner walked into the street—was it because Turner believed Lundry waved her into the street as the family maintained, or was it because she was impaired and crossed the street at an improper place without looking for oncoming traffic? They also urge that the court of appeals failed to properly discern the difference between "prejudicial" and "unfairly prejudicial" when it weighed the probative value of the evidence.

The family counters that the trial court did not abuse its discretion in excluding the evidence because its probative value was low and the danger of unfair prejudice was high. The family asserts that there was no evidence Turner was impaired at the time of the accident, Dr. Miller did not link the results of the toxicology report with any of Turner's actions, and the stigma associated with schizophrenia and drug use would have created a high danger of unfair prejudice.

## A. Standard of Review

A trial court's exclusion of evidence is reviewed for abuse of discretion. *Caffe Ribs, Inc. v. State*, 487 S.W.3d 137, 142 (Tex. 2016). If a trial court abuses its discretion and erroneously

7

excludes evidence, then the question is whether the error "probably caused the rendition of an improper judgment." TEX. R. APP. P. 61.1(a); *see Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989). That standard does not require the complaining party "to prove that 'but for' the exclusion of evidence, a different judgment would necessarily have resulted." *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009). Rather, if erroneously excluded evidence was "crucial to a key issue," then the error was likely harmful—that is, it probably caused the rendition of an improper judgment—unless the evidence was cumulative or the rest of the evidence was so one-sided that the error likely made no difference in the judgment. *Id.*

## B. Analysis

Relevant evidence is presumed to be admissible. TEX. R. EVID. 402. Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." TEX. R. EVID. 401. However, pursuant to Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." TEX. R. EVID. 403. "Testimony is not inadmissible on the sole ground that it is 'prejudicial' because in our adversarial system, much of a proponent's evidence is legitimately intended to wound the opponent." *Diamond Offshore Servs. Ltd. v. Williams*, 542 S.W.3d 539, 549 (Tex. 2018). Rather, "*unfair* prejudice is the proper inquiry," and "'[*u*]*nfair* prejudice' within its context means an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.*

8

### 1. Was the exclusion error?

When determining admissibility of evidence under Rule 403, trial judges must balance the probative value of the evidence against relevant countervailing factors. *Id.* at 544–45. Evidence that a party to an accident was intoxicated or impaired is not, in and of itself, evidence that the party acted negligently in relation to the accident. *See Benoit v. Wilson*, 239 S.W.2d 792, 798 (Tex. 1951). However, such evidence is probative if it is relevant to a party's actions in conforming or failing to conform to an appropriate standard of care. *See id.* ("Evidence of intoxication is an evidentiary fact to be considered by the jury, or trier of the facts, in determining whether or not a person is guilty of some act of contributory negligence . . . ."). For example, in *PPC Transp. v. Metcalf*, 254 S.W.3d 636, 644 (Tex. App.—Tyler 2008, no pet.), the court of appeals held that the trial court erred by excluding evidence the plaintiff had been drinking alcohol before an automobile accident. In reaching its conclusion, the court noted that "Metcalf's consumption of alcohol was relevant in conjunction with evidence concerning his failure to steer his vehicle away from Weatherly's trailer, a matter concerning his vigilance, judgment, and reactions as a driver . . . . Metcalf's ability to control his vehicle was critical to the issue of probable cause, and as it relates thereto, evidence of his consumption of alcohol was highly probative on that issue as well." *Id.* at 642–43.

Other courts of appeals have similarly held that evidence of a party's use of impairing substances is admissible if the evidence raises a question about why the party acted as he or she did in connection with the occurrence. *See, e.g.*, *Ticknor v. Doolan*, No. 14-05-00520-CV, 2006 WL 2074721, at *2, *6 (Tex. App.—Houston [14th Dist.] July 27, 2006, pet. denied) (mem. op.) (trial court erred by excluding evidence of a bicyclist's alcohol use where there was evidence that he

suddenly veered in front of a car, putting his "vigilance, judgment or reactions" at issue); *Nichols v. Howard Trucking Co.*, 839 S.W.2d 155, 157–58 (Tex. App.—Beaumont 1992, no writ.) (trial court did not err by admitting evidence of urinalysis which was positive for marijuana when it "was offered on the intoxication issue and as an explanation for why Mr. Nichols' vehicle crossed the center line causing the collision"); *Ford Motor Co. v. Whitt*, 81 S.W.2d 1032, 1037 (Tex. App.—Amarillo 1935, writ ref'd) ("Evidence of intoxication of a tort feasor or injured person at the time of an accident or injury for which damages are sought to be recovered is admissible on the question of his guilt or negligence which caused or contributed to the injury." (quoting 45 C.J. 1244 § 806)); *cf. Bedford v. Moore*, 166 S.W.3d 454, 465 (Tex. App.—Fort Worth 2005, no pet.) ("[E]vidence of drug usage must provide some explanation for the negligence and improper conduct. However, this was not present under our facts because Dr. Drew could not tie the presence of methamphetamines in Moore's body to impairment at the time of the accident, and therefore could not connect the presence of the drug to causation.").

The same analysis applies to evidence of a mental health issue in negligence cases—it is relevant when other evidence supports a finding that the mental impairment contributed to the party's allegedly negligent actions. As with evidence of drug or alcohol usage, evidence of a mental health condition is not invariably relevant. But courts have held mental health evidence admissible when it provides insight into relevant issues in the case. For example, in *Garza v. Garza*, a mother challenged the trial court's admission of her medical and mental health records. 217 S.W.3d 538, 554 (Tex. App.—San Antonio 2006, no pet.). The court of appeals affirmed, determining that the mother's "medical condition relating to her personality and bipolar disorders was relevant to the

10

issue of whether appointing her sole managing conservator was in her children's best interests." *Id.* at 555; *cf. Torres v. Danny's Serv. Co.*, 266 S.W.3d 485, 488 (Tex. App.—Eastland 2008, pet. denied) (trial court erred in admitting evidence of a witness's mental health condition for impeachment purposes where there was no indication her condition impacted her memory or perception).

Here, the evidence connected Turner's mental health and drug use to her walking into the road outside a cross walk when a large truck was moving toward her. In Dr. Miller's offer of proof testimony, he stated that after watching the video of Turner walking into the road and into the truck without slowing down, that

> [C]ertainly to me in my experience—my education, training and experience, [Turner's action] fits the scenario of a person who is not only impacted by medication but more likely is having an exacerbation of a severe mental condition particularly of the nature of schizophrenia paranoid type and bipolar disorder.

He also testified that Turner

> had a level of opiates in her system which could impair her condition. She was not taking at least two of her prescribed medicines that would improve her condition. She had cocaine in her system. Those things can sure impair you . . . to a reasonable degree of medical certainty . . . those things can contribute to a mental impairment.

Such evidence was related to Turner's "vigilance, judgment, and reactions" in walking into the road when and where she did and under circumstances where she had an unrestricted view of a large truck moving toward her. *See PPC Transp.*, 254 S.W.3d at 642–43; *Ticknor*, 2006 WL 2074721, at *2.

The family asserts that the probative value of the evidence of drug use was extremely low because there was no evidence Turner was impaired. They first point to Dr. Miller's deposition testimony where he stated that he had no specific proof any substance was impairing Turner at the

11

time of the accident. But Dr. Miller clarified in his deposition that he had not seen the toxicology report or the autopsy, while his offer of proof testimony at trial showed that after his deposition he reviewed those documents and took them into account in forming his opinion that Turner's action as depicted in the video "fit the scenario" of a person impacted by a mental condition, medication, and drugs.

The family argues that Dr. Miller's bill of exception testimony does not show Turner was actually intoxicated or impaired. But a specific showing of intoxication is not required in order for evidence regarding the use of substances to be admissible. *See Ford Motor Co.*, 81 S.W.2d at 1037 (evidence of smell of liquor on a driver's breath was admissible in light of evidence that the driver swerved to the opposite side of the road). As for impairment, Dr. Miller's testimony sufficiently linked Turner's mental health and drug use to her actions to make it relevant to and probative of the question of whether her mental health, drug use, or both, were connected to the actions she took relative to her death, and particularly to the question of whether her actions were such as would have been taken by a person using ordinary care. *See* TEX. R. EVID. 401 (providing that "evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence").

The family contends that the danger of unfair prejudice was high because of the stigma associated with schizophrenia and drug use. To the extent any stigma associated with mental illness might raise prejudice concerns, as noted above, the key question in analyzing this assertion is not whether the evidence is prejudicial, but whether it is *unfairly* prejudicial. Evidence is *unfairly* prejudicial if it has an "undue tendency to suggest a decision on an improper basis, commonly,

12

though not necessarily, an emotional one." *Diamond Offshore Servs.*, 542 S.W.3d at 549. The jury was tasked with deciding whether Turner acted with ordinary care in walking into the street under the circumstances. That necessarily required it to evaluate her mental and decision-making processes. The excluded evidence would have allowed the jury at least some view of those processes when it assessed whether her actions met the standard of ordinary care—that is, whether she walked into the street because her mental processes were impaired, or because Lundry's hand signals induced her to do so, as the family asserted. *See id.* ("The [excluded evidence] does not encourage the jury to decide on any improper basis, but rather on the basis that Williams's condition is not as severe as he claims. That is not unfair."); *PPC Transp.*, 254 S.W.3d at 643 (concluding that the danger that the jury might derive "unfair negative connotations" from evidence the defendant had consumed alcohol before an auto accident did not substantially outweigh its probative value because the evidence "serves to provide the jury with a clearer understanding of the evidence of Metcalf's driving ability, vigilance, judgment, and ability to react at the time of the accident"); *Garza*, 217 S.W.3d at 555 (finding that the probative value of a mother's mental health records outweighed any danger of unfair prejudice where the mother's mental state was relevant to the issue of child custody and to the best interests of the children). Absent the excluded evidence, the jury was not properly informed in making its decision. It had to judge Turner's decision-making processes and actions after having seen and heard only a limited, filtered version of the evidence as to those processes and actions. While we recognize the potential for jurors to derive unfair negative connotations from the excluded evidence, under these circumstances, that potential is not

13

substantially outweighed by the probative value of the evidence. Thus, the evidence is not *unfairly* prejudicial.

The family also argues that the probative value of the excluded evidence was lower because the jury was able to view a video of the events in determining who was at fault. We disagree. The video of the occurrence, in combination with other evidence the family introduced, provided a one-sided view of the possible *reasons* for Turner's actions. An expert witness called by the family addressed that question. He opined that, considering the video and Lundry's testimony, Turner may have walked into the street in response to the hand motions that Lundry testified he directed toward the driver of the car blocking his turn from Rittiman onto Goldfield. That theory was brought up by the family throughout the trial. The evidence Lundry and JBS sought to introduce undoubtedly would have been prejudicial to the family's theory if the evidence had been admitted—as "much of a proponent's evidence is legitimately intended to wound the opponent." *See Diamond Offshore Servs. Ltd.*, 542 S.W.3d at 549. The excluded evidence would have provided a distinct and completely different reason for Turner's actions from that advanced by the family.

In sum, we agree with Lundry and JBS that allowing them to introduce evidence providing an alternative explanation for Turner's actions—her mental condition and the drugs and alcohol in her system— would not have been *unfairly* prejudicial to the Family when considered in context of the record as a whole. The probative value of the excluded evidence was high, not low, when considered in context with the video and other evidence the family introduced regarding Turner's actions related to the question of why Turner walked into the street.

14

We conclude that the trial court erred by excluding the toxicology report and Dr. Miller's opinion that Turner's mental health condition and the drugs in her system likely contributed to her actions. That being said, an erroneous exclusion of evidence is not reversible error unless it was harmful—that is, it "probably caused the rendition of an improper judgment." TEX. R. APP. P. 61.1(a). We address that question next.

## 2. Harm

"Exclusion of evidence is likely harmless if the evidence was cumulative or if the rest of the evidence was so one-sided that the error likely made no difference in the judgment." *Gunn v. McCoy*, 554 S.W.3d 645, 668 (Tex. 2018). But the exclusion "is likely harmful if it was 'crucial to a key issue.'" *Id.*

The first consideration—whether the evidence was cumulative or strongly one-sided— does not support a conclusion that the exclusion was harmless. To begin with, the excluded evidence was not cumulative. It related directly to Turner's state of mind and mental condition that resulted in her decision to walk into the street where and under the circumstances she did. Absent the excluded evidence, the only evidence the jury heard as to those matters was opinion testimony from an expert called by the family. That testimony did not address the question of whether Turner had impaired thought processes or perception abilities. To the contrary, it implied that she was *not* impaired and saw Lundry's hand signal and interpreted it as an ordinary person would have—as a direction for her to continue walking across the street. Further, the evidence was not heavily one-sided in favor of the family's position. The liability and percentage of responsibility questions largely turned on why Lundry did not see and avoid running over Turner, and why Turner did not avoid colliding with

15

the plainly visible truck. While Lundry testified directly as to why he did not see Turner, the family's evidence as to why Turner acted as she did was largely speculative and based primarily on opinion evidence by the family's expert.

As to the second consideration, whether the excluded evidence was crucial to a key issue, it is unquestionable that Turner's state of mind and mental decision-making processes were crucial to the key issue of whether her decision to walk into the street met the standard of reasonable care. As noted above, the family's theory was that Turner began to cross the street some distance from the crosswalk because she saw Lundry's hand signal and thought he was signaling her to cross. The family's expert witness testified that in his opinion Turner was looking at the truck and "she could *probably* see the guy doing the hand signals. *Maybe* she thought he was signaling her forward." (emphasis added). The attorney for the family asked another witness about Lundry's hand signal and also brought it up in closing argument. The evidence offered by Lundry and JBS was designed to directly rebut the family's theory by showing that Turner did not walk into the street because she thought she had been given a signal to cross, but rather did so because she was impaired to the extent she did not stop walking even in light of the clearly visible moving truck. Evidence of Turner's impairment was crucial to the questions of whether her actions fell below the standard of reasonable care, and if so, the extent to which her impairment and actions made her responsible for the occurrence. The jury found her 20% responsible even absent evidence that she was impaired. The proffered evidence likely would have affected the jury's allocation of responsibility to both Lundry and Turner, at a minimum. Thus, the trial court's erroneous exclusion of the evidence probably

16

caused rendition of an improper judgment. That being so, the court of appeals erred by affirming the trial court's judgment.

### III. JBS's Direct Negligence

JBS asserts that it cannot be held directly liable for two reasons. First, there is no evidence to support the negligent training theory of liability. Second, a direct negligence claim may not be submitted as to a corporate employer if that employer has already conceded that it will be vicariously liable for any negligence found against its employee.

As to the first issue, sufficiency of the evidence, the family claims JBS waived the issue by focusing its briefing on the second issue regarding its direct liability. The family also asserts that the evidence of JBS's failure to train Lundry as to the blind spot in front of his truck supports the jury's finding of direct negligence.

In responding to the second issue—that JBS cannot be held directly liable because it has admitted vicarious liability—the family argues that JBS waived the issue because it made the argument for the first time in this Court. In the alternative, the family asserts that the Legislature has mandated that the negligence of each responsible party must be considered, thus a defendant's direct negligence should be considered even if that defendant may also be vicariously liable for its employee's negligence. *See* TEX. CIV. PRAC. & REM. CODE § 33.011(6). Thus, the family argues, they had the right to submit both Lundry's negligence and JBS's independent, direct negligence for the jury to consider in apportioning responsibility, and the fact that JBS agreed to be financially responsible for any judgment against Lundry did not make JBS any less independently negligent in causing Turner's death.

17

## A. Legal Sufficiency

### 1. Preservation

JBS stated in its brief in this Court that "[t]he court of appeals erroneously tagged JBS for direct liability based on a specious 'negligent training' theory for which there is no evidence to support." It made other no-evidence challenges in addition to the foregoing. For example, it urged that "[t]here is no evidence that JBS's training program is faulty," and challenged the trial court's failure to enter a judgment notwithstanding the verdict, which it argued in the trial court was appropriate based on the lack of evidence to support the jury's verdict. We conclude that JBS preserved its legal sufficiency challenge. *See Weeks Marine, Inc. v. Garza*, 371 S.W.3d 157, 162–63 (Tex. 2012) ("Appellate courts must treat the statement of an issue 'as covering every subsidiary question that is fairly included.'" (quoting TEX. R. APP. P. 38.1(f))).

### 2. The Evidence

"Evidence is legally insufficient to support a jury finding when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact." *Gunn*, 554 S.W.3d at 658. We must consider all of the evidence "'in the light most favorable to the party in whose favor the verdict has been rendered,' and 'every reasonable inference deducible from the evidence is to be indulged in that party's favor.'" *Id.* (quoting *Bustamonte v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)). If the evidence offered to prove

a vital fact's existence is "so weak as to do no more than create a mere surmise or suspicion," the record contains less than a scintilla. *Id.*

JBS asserts that there is no evidence its training program fell below the level which a reasonably prudent employer in the industry would have provided. It contends the evidence supporting the family's direct negligence claim was essentially that a blindspot existed in front of the truck and the JBS training manual did not reference it. JBS also argues that even if a blind spot was a contributing factor in Turner's death, the family did not provide any evidence that if JBS had specifically trained Lundry about the blind spot, the accident would not have happened. *See Dangerfield v. Ormsby*, 264 S.W.3d 904, 912 (Tex. App.—Fort Worth 2008, no pet.) ("To establish a claim for negligent training, a plaintiff must prove that a reasonably prudent employer would have provided training beyond that which was given and that failure to do so caused his injuries."); *LaBella v. Charlie Thomas, Inc.*, 942 S.W.2d 127, 137 (Tex. App.—Amarillo 1997, writ denied) ("[T]he negligence in hiring, [training, or supervising] must be the proximate cause of the injuries to the plaintiff.").

In response, the family points to evidence that a 2014 JBS training manual indicated three specific blind spots, but did not mention a blind spot in front of the truck. Further, the family notes Lundry's testimony that he could not recall any specific training by JBS concerning the blind spot to the front of the truck. The family asserts that had Lundry been trained about the blind spot, he would have known that just because he could not see anything in front of him did not mean that there was nothing there. The court of appeals credited this evidence on lack of training regarding

19

a blind spot as legally sufficient to support the finding of direct negligence against JBS. 513 S.W.3d at 709– 10.

As JBS notes, we "have not ruled definitively on the existence, elements, and scope of such torts and related torts such as negligent training and hiring." *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804 n.7 (Tex. 2010). However, we have considered evidentiary challenges to jury findings regarding such claims. *See, e.g.*, *Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 790, 796–97 (Tex. 2006). In those matters, we have required evidence that the employer's alleged negligence caused the injury. *Id.* at 796 ("There is no evidence to support the jury's finding that Fifth Club's lack of a background check of West caused the altercation or the injuries. As to negligence in hiring, the evidence indicates that even if Fifth Club had investigated West before hiring him, nothing would have been found that would cause a reasonable employer to not hire West."). For the reasons expressed below, we agree with JBS that even if a cause of action for negligent training exists, the family presented no evidence that the lack of training regarding a blind spot in front of the truck was a proximate cause of Turner's injuries.

Lundry testified that he did not see Turner, and when he started his turn he checked his left and right mirrors and made sure no one was in the crosswalk. The expert for JBS and Lundry testified that Turner was in Lundry's blind spot. The family's expert witness disagreed that there was a blind spot that prevented Lundry from seeing Turner.

The court of appeals agreed with the family that if Lundry had been trained about the claimed blind spot "'he would have known that he could not assume that just because he did not see anything in front of him' did not mean there was not anyone in front of him." 513 S.W.3d at 710.

20

The appeals court also agreed with the family that "the jury was free to conclude that JBS failed to use ordinary care when it instructed Lundry on how to safely operate the 18-wheeler . . . when it failed to determine whether Lundry's seat position allowed him to see in front of the truck." *Id.*

The single negligence question in the jury charge asked whether "the negligence, if any, of those named below proximately cause[d] the occurrence in question." Lundry, JBS, and Turner were named. Proximate cause was defined as follows:

> "Proximate cause" means a cause that was a substantial factor in bringing about an occurrence and without which cause such occurrence would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using *ordinary care* would have foreseen that the occurrence, or some similar occurrence, might reasonably result therefrom. There may be more than one proximate cause of an occurrence.

JBS disputes the family's claim that there was evidence it failed to train Lundry about the blind spot in front of the truck. But even assuming there was evidence it failed to do so, JBS further maintains there was no evidence that its failure was a cause in fact of the occurrence; that is, there was no evidence that had it so trained Lundry, the occurrence would have been avoided. We agree. Assuming there was evidence that Lundry was not trained regarding the blind spot, there was no evidence that if he had received such training the occurrence would not have happened. Thus, there was no evidence that the alleged absence of training by JBS as to the blind spot in front of the truck proximately caused the occurrence. That part of the judgment based on the finding that JBS's direct negligence was a proximate cause of the occurrence is reversed.

21

In light of the foregoing, we need not and do not reach JBS's contention that its direct liability should not have been submitted to the jury because JBS did not contest its vicarious liability for Lundry's actions.

## IV. Conclusion

We reverse the judgment of the court of appeals. We render judgment that the family take nothing against JBS on the direct negligence claim. We remand the claims against Lundry and those against JBS based on respondeat superior to the trial court for further proceedings consistent with this opinion.

_____
Phil Johnson
Justice

**OPINION DELIVERED:** December 21, 2018

22