## Fourth Court of Appeals
### San Antonio, Texas
**MEMORANDUM OPINION**
No. 04-22-00072-CV



**JMI CONTRACTORS**, LLC,
Appellant

v.

Jose Manuel **MEDELLIN**,
Appellee

From the 285th Judicial District Court, Bexar County, Texas
Trial Court No. 2018-CI-05983
Honorable Aaron Haas, Judge Presiding

Opinion by:    Rebeca C. Martinez, Chief Justice

Sitting:       Rebeca C. Martinez, Chief Justice
               Luz Elena D. Chapa, Justice[1]
               Liza A. Rodriguez, Justice[2]

Delivered and Filed: June 28, 2023

REVERSED AND REMANDED

Appellant JMI Contractors, LLC appeals from a $4,637,375.72 judgment, rendered in

accordance with a jury verdict, in favor of appellee Jose Manuel Medellin for injuries Medellin

sustained while he worked at a JMI jobsite. In twenty-four issues, which we reorder and broadly

reclassify as three, JMI complains that: (1) the evidence is legally and factually insufficient to

support nearly every answer in the verdict, including Medellin's premises liability, negligent

---

[1] Justice Chapa dissents without opinion.
[2] Justice Rodriguez joins this memorandum opinion as to part II.B and concurs in the judgment.

activity, and gross negligence claims and eleven of the thirteen damage elements; (2) the trial court abused its discretion in three evidentiary rulings; and (3) Medellin's counsel made an incurable jury argument. We reverse and remand.

## I. BACKGROUND

At trial, Michael Garcia, JMI's half owner, testified that JMI is a renovation and restoration company that provides exterior repair services to multifamily housing developments such as apartment complexes, condominiums, and townhomes. Michael Garcia further testified that JMI secured a bid to repair hail damage to the roof of the Oaks on Bandera Apartments (the Oaks Apartments), a multi-building residential apartment complex. To complete this roofing project, JMI relied on a mixture of JMI and non-JMI employees. The JMI employees included John Obiedo, a JMI project superintendent, and Carlos Angelini, a JMI safety advisor. Michael Garcia testified that JMI also relied on Raul Rodriguez and Abelardo "Lalo" Hernandez. Raul Rodriguez testified that he owned ANR Construction, but at other times, he testified that he was a JMI roofing supervisor. Hernandez testified that he owned Metal Roof & TPO Specialist, LLC. According to Hernandez, either Michael Garcia or Raul Rodriguez asked him to apply thermoplastic polyolefin ("TPO"), which is a single-ply rubberized roofing membrane, to a single building at the Oaks Apartments. Hernandez described the job as a "sample," and if the premises owner was satisfied, he would be awarded a contract to apply TPO to the remaining buildings.

Medellin testified that he performed roofing work for various roofers, including Hernandez's Metal Roof and Sandoval Roofing. Medellin recalled that, on the morning of Saturday, March 10, 2018, Hernandez asked him to help with the project at the Oaks Apartments. At the time Hernandez called him, Medellin was at Sandoval Roofing collecting a paycheck for work he had done earlier in the week. Medellin, lacking transportation, invited Luis Garcia, a fellow roofer, to work at the Oaks Apartments. Luis Garcia testified that he picked up Medellin

from Sandoval Roofing, and they drove to the jobsite. Medellin testified that his job at the project consisted of unrolling, stretching, and positioning TPO material. Medellin worked closely with Reybel Rodriguez, Raul Rodriguez's nephew. Reybel Rodriguez recalled telling Medellin, "you pull this way, I pull this, go that away, I go this way." Reybel Rodriguez also recalled that he and Medellin were stretching out a piece of plastic roofing material when Medellin fell off the roof. When asked by JMI to describe how he fell off the roof, Medellin testified, "[b]ecause the man told me to pull the whole roll. And because everybody was going so fast, he said go, go, go, go. I continued walking and for — and because I was observing the man that told me, I forgot about the edge and I fell."

The jury found that JMI exercised or retained some control over the use of fall protection safety measures for the roofing work performed at the Oaks Apartments on the day of the incident, other than the right to order the work to start or stop or to inspect progress or receive reports. It found that Raul Rodriguez was an employee of JMI. The jury also found that JMI was negligent under premises-liability and negligent-activity claims, and it found that neither Medellin nor Metal Roof were negligent under the same claims. The jury assessed $3,337,779.34 in ordinary damages. As for Medellin's gross negligence claims, the jury found Angelini grossly negligent, but it refused to find Garcia, Obiedo, and Raul Rodriguez grossly negligent. The jury assessed one million dollars in exemplary damages.

The trial court signed a final judgment in accordance with the jury's verdict. JMI filed motions for a judgment notwithstanding the verdict and for a new trial. The trial court overruled JMI's post-judgment motions. JMI timely appealed from the trial court's final judgment.

## II. DISCUSSION

### A. Liability Claims[3]

JMI's first issue, as I construe it, challenges, among other things, the jury's finding that it was negligent under Medellin's premises-liability and negligent-activity claims. Specifically, JMI challenges the applicability of the necessary-use exception that was submitted with Medellin's premises-liability claim and the legal and factual sufficiency of the evidence supporting Medellin's negligent-activity claim.

#### 1. Standard of Review

"In a legal sufficiency challenge, we consider whether the evidence at trial would enable a reasonable and fair-minded fact finder to reach the verdict under review." *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). "Evidence is legally insufficient to support a . . . finding when[:] (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact." *Gunn*, 554 S.W.3d at 658 (citations omitted). More than a mere scintilla of evidence exists when the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id*. (citing *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003)). Conversely, less than a scintilla of evidence exists when the evidence offered to prove a vital fact's existence is "so weak as to do no more than create a mere surmise or suspicion." *Id*. (quoting *King Ranch*, 118 S.W.3d at 751). All the record evidence must be considered in the light most favorable to the verdict — "every reasonable inference deducible from

---

[3] As to part II.A, Chief Justice Martinez writes separately.

the evidence is to be indulged in that party's favor." *Id*. (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)).

## 2. Theories of Recovery

In *Occidental Chemical Corporation v. Jenkins*, 478 S.W.3d 640, 644 (Tex. 2016), the Texas Supreme Court wrote that:

> [A] person injured on another's property may have either a negligence claim or a premises-liability claim against the property owner. When the injury is the result of a contemporaneous, negligent activity on the property, ordinary negligence principles apply. When the injury is the result of the property's condition rather than an activity, premises-liability principles apply.

(citing *Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex. 1992); *H.E. Butt Grocery Co. v. Warner*, 845 S.W.2d 258, 259 (Tex. 1992)). Negligence and premises-liability claims thus are separate and distinct theories of recovery, requiring plaintiffs to prove different, albeit similar, elements to secure judgment in their favor. *United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 471 (Tex. 2017) (citing *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 775–76 (Tex. 2010); *Keetch*, 845 S.W.2d at 264). Because negligence and premises-liability claims are based on independent theories of recovery, the Texas Supreme Court has held that they are not interchangeable. *Id.* (citing *Occidental*, 478 S.W.3d at 644; *Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 529 (Tex. 1997)).

Negligent-activity and premises-liability claims "involve closely related but distinct duty analyses." *Id.* (citing *W. Invs., Inc. v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005)). In a negligent-activity case, a property owner or occupier must "do what a person of ordinary prudence in the same or similar circumstances would have . . . done," whereas a property owner or occupier in a premises-liability case must "use ordinary care to reduce or eliminate an unreasonable risk of harm created by a premises condition which the owner or occupier [of land] knows about or in the exercise of ordinary care should know about." *Id*. (quoting *Timberwalk Apartments, Partners, Inc.*

*v. Cain*, 972 S.W.2d 749, 753 (Tex. 1998)). "Underpinning the distinctions between these claims is the principle that 'negligent activity encompasses a malfeasance theory based on affirmative, contemporaneous conduct by the owner that caused the injury, while premises liability encompasses a nonfeasance theory based on the owner's failure to take measures to make the property safe.'" *Id*. (quoting *Del Lago*, 307 S.W.3d at 776). "Generally, a plaintiff need only submit a general-negligence question in support of its claim for a defendant's liability under a negligent-activity theory." *Id.*

### 3.  Premises-Liability Claim & Necessary-Use Exception

The premises-liability question in the jury charge instructs that JMI was negligent if, among other premises-liability elements, Medellin necessarily had to use the premises. Generally, a landowner has a duty to exercise reasonable care to make its premises safe for invitees. *Austin v. Kroger Tex., L.P.*, 465 S.W.3d 193, 202 (Tex. 2015). In most cases, the landowner can satisfy its duty by providing an adequate warning of the danger. *Id.* However, exceptions exist, such that a landowner's warning or an invitee's knowledge of a risk is insufficient to make the premises reasonably safe. *Id*. One such exception is the necessary-use exception. *Id*. It "recognizes a landowner's duty to make its premises safe when, despite [the invitee's] awareness of the risks, it is necessary that the invitee use the dangerous premises and the landowner should have anticipated that the invitee is unable to take measures to avoid the risk." *SandRidge Energy, Inc. v. Barfield*, 642 S.W.3d 560, 568 (Tex. 2022) (quoting *Austin*, 465 S.W.3d at 208). The necessary-use exception effectively holds that there are some unreasonably dangerous situations for which no warning can be adequate. *Id*.

In *SandRidge*, the Texas Supreme Court recognized that it had previously "expressed doubt that the necessary-use exception applies to independent contractors." *Id*. (citing *Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 215–16 (Tex. 2008)). *SandRidge* emphasizes *General Electric's*

observation that "one who hires an independent contractor generally expects the contractor to take into account any open and obvious premises defects in deciding how the work should be done, what equipment to use in doing it, and whether its workers need any warnings." *SandRidge*, 642 S.W.3d at 568 (citing *Gen. Elec. Co.*, 257 S.W.3d at 215–16). The claimed premises defect in *General Electric* was a loading ramp without railings. *Gen. Elec. Co.*, 257 S.W.3d at 215–16. The court held that the absence of railings was open and obvious to the employee of the independent contractor; and therefore, the landowner did not owe a duty to warn the contractor's employee. *Id*. In *SandRidge*, a premises owner hired an independent contractor to modify electrical distribution lines. 642 S.W.3d at 564. The alleged premises defect in *SandRidge* was energized electrical distribution lines in need of replacement, which an employee of an independent contractor inadvertently touched; the employee sustained significant injuries from the contact. *Id*. at 569. The court assumed, without deciding, that the necessary-use exception extended from a premises owner to contractors. *Id*. It highlighted that the independent contractor's employee had effectively used a "hot stick" — a specialized tool used on energized electrical lines — to disconnect "hot taps hundreds of times" over the course of six months. *Id*. This evidence, according to the court, allowed the premises owner to expect that the independent contractor would take the energized lines into account in instructing and equipping the independent contractor's employee to avoid the risk. *Id*.

JMI argues that the evidence is legally and factually insufficient to support the jury's determination that it was negligent under Medellin's premise-liability claim because the only evidence Medellin offered to establish its negligence was that JMI violated a federal Occupational Safety and Health Administration ("OSHA") regulation. JMI further argues that it owed no duty to warn of an open and obvious danger to Medellin, whom JMI classifies as "an independent contractor working for an independent contractor, Metal Roof." Relatedly, JMI argues that

Medellin is not entitled to the necessary-use exception because he was "an independent contractor of an independent contractor," and he could have declined working on the roof. Medellin responds by surveying the origins of the necessary-use exception in Texas law and emphasizing that there was "no evidence that Medellin could have taken steps to force JMI to" deploy fall prevention measures. According to Medellin, any argument that he "should have refused to climb the ladder to the roof or decline to perform his job is meritless."

While JMI prefaces its necessary-use exception argument in legal and factual sufficiency terms, the gravamen of JMI's argument is elsewhere. JMI invites us to declare that an independent contractor is, as a matter of law, not entitled to the necessary-use exception.[4] While *SandRidge* expressed doubt about whether the necessary-use exception applies to independent contractors, it could have — but did not — issue the holding that JMI now seeks. Instead, *SandRidge* analyzed the facts to determine whether the necessary-use exception applied when an employee of a subcontractor was injured. *SandRidge*, 642 S.W.3d at 569.[5] Cognizant of our position as an intermediate appellate court, I respectfully decline JMI's invitation to issue a holding that *SandRidge* contemplated but declined. *See Petco Animal Supplies, Inc. v. Schuster*, 144 S.W.3d 554, 565 (Tex. App.—Austin 2004, no pet.) ("As an intermediate appellate court, we are not free to mold Texas law as we see fit but must instead follow the precedents of the Texas Supreme Court

---

[4] Medellin asserts that JMI made no objection to the "form of the [premises-liability] question presented at trial and on appeal." JMI moved for directed verdict on, among other things, Medellin's premises-liability claim. In JMI's directed-verdict motion, it argued that "[i]n this case we have a subcontractor of a subcontractor and, therefore, there's no evidence based upon just failure to comply with the OSHA standards to create any type of duty owed or special duty owed in this case." In JMI's motion for new trial, it references the necessary-use exception instruction in the premise-liability question and argues that "[n]othing prevented [Medellin] from asking for or using fall protection, if he wanted, when he was aware of the risk." These motions sufficiently preserve the challenge that JMI now presents.

[5] Two of our sister courts have followed *SandRidge's* example, and, after analyzing the facts, determined that the necessary-use exception did not apply when employees of a contractor sued the premises owner. *See Vance v. Hurst Joint Ventures LP*, 657 S.W.3d 141, 153 (Tex. App.—El Paso 2022, no pet.); *see also Battles v. Anthony Inman Constr., Inc.*, No. 07-22-00122-CV, 2023 WL 2498920, at *4 (Tex. App.—Amarillo Mar. 14, 2023, no pet. h.).

unless and until the high court overrules them or the Texas Legislature supersedes them by statute.").

Therefore, JMI's sub-issue that challenges the legal sufficiency underlying Medellin's premises-liability claim is overruled.

### 4. Negligent-Activity Claim

"Recovery on a negligent[-]activity theory requires that the person have been injured by or as a contemporaneous result of the activity itself rather than by a condition created by the activity." *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 753 (Tex. 1998). When analyzing a negligence claim, we first ask whether the defendant owed the plaintiff a duty. *JLB Builders, L.L.C. v. Hernandez*, 622 S.W.3d 860, 864 (Tex. 2021) (citing *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 783 (Tex. 2001)). Whether JMI owed Medellin a duty is governed by our law concerning a general contractor's duties to a subcontractor's employees. *See id.* "As a general rule, one who employs an independent contractor has no duty to ensure that the contractor safely performs its work." *Id.* at 864–65 (citing *AEP Tex. Cent. Co. v. Arredondo*, 612 S.W.3d 289, 295 (Tex. 2020)). "However, an exception to this rule arises when the employer retains some control over the manner in which the contractor performs the work that causes the damage." *Id.* (citations omitted). "A plaintiff can prove the requisite control by establishing that the general contractor either actually controlled the manner in which the subcontractor performed its work or had a contractual right to do so."[6] *Id.* (citing *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 606 (Tex. 2002)). "In either case, the 'control must relate to the condition or activity that caused the injury.'" *Id.* (quoting *Olivo*, 952 S.W.2d at 528). "Further, the control retained or exercised by the general

---

[6] In this case, JMI and Metal Roof executed a written contract regarding roofing work at the Oaks Apartments on March 20, 2018.

contractor must extend[ ] to the means, methods, or details of the independent contractor's work." *Id*. (citations omitted).

JMI argues that Medellin's negligent-activity claim is supported by legally insufficient evidence because, among other things, there is no evidence that it retained either actual or contractual control over the activity that caused the injury. As support for its contention regarding no evidence of actual control, JMI references *Hernandez v. Hammond Homes, Ltd.*, 345 S.W.3d 150, 154–56 (Tex. App.—Dallas 2011 pet. denied), for its holding that "an employer of an independent contractor does not owe a duty to ensure that the independent contractor performs its work in a safe manner." *Id*. at 153 (citing *Gen. Elec.*, 257 S.W.3d at 214; *Redlinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985)).

In his response, Medellin argues that JMI exercised actual control "over the fall protection to use, or not use" and "through directing the work be performed in a certain way or in approving of work being done" in a way that led to his injury. Medellin highlights Raul Rodriguez's admission that he knew there was a danger that the workers could have fallen off a roof while working without fall protection. Medellin emphasizes that neither he nor Hernandez had any authority to "install a structural steel anchor." Medellin contends that the case of *Lee Lewis Construction*, 70 S.W.3d at 783–84, is factually similar and militates against JMI's legal sufficiency challenge.

In *Lee Lewis Construction*, the plaintiff was working for a subcontractor on a construction site where the defendant was the general contractor when the plaintiff fell from the tenth story. *Id*. at 781. The evidence was undisputed that the plaintiff was not using an independent lifeline that would have stopped his fall. *Id*. at 782. *Id*. The general contractor's owner and president testified that it had a superintendent on the ninth and tenth floors with "the responsibility . . . to see to it that the subcontractors and their employees properly utilized fall protection equipment." *Id*. at

784. This superintendent personally approved the lanyard system used by the subcontractor. *Id.* The superintendent also knew of and did not object to the subcontractor's employees' use of a bosun's chair without an independent lifeline. The supreme court held that this testimony constituted more than a scintilla of evidence that the defendant retained the right to control the fall protection systems used on the jobsite. *Id.*

Here, the trial court admitted an "Incident Analysis Form," which was completed by Angelini, witnessed by Raul Rodriguez, and signed by Hernandez. The form describes the incident as:

> Roofer was standing approximately six feet from the edge of flat roof when he was pulling on material when he slipped and fell backwards causing him to fall over the edge, landing on his hip and arm. He was taken to the hospital for examination. **There was a watchman on duty**.

(Emphasis added). Garcia testified that JMI's post-accident investigation "determined there was a watchman present[,] which was serving as fall protection." Angelini acknowledged completing the post-accident report and testified that a "watchman is a person that's assigned to just watch. He doesn't do anything, no work, no physical work at all. He lets the people know when they're getting too close to the edge, you know, warns them, brings them back." Hernandez believed that Raul Rodriguez was the watchman, elaborating that "it had to be Raul because he wasn't doing nothing. [sic] He was just watching."[7]

I conclude that this case is more analogous to *Lee Lewis Construction* than to *Hernandez*. In *Hernandez*, our sister court distinguished *Lee Lewis Construction* by holding that the general contractor "did not require the use of fall-protection equipment, did not have anyone assuring that fall-protection equipment was used by the roofers, and did not approve acts that were dangerous

---

[7] I note that at another point, Hernandez was asked, "[b]ut nobody — to your knowledge, nobody designated Raul [Rodriguez] as the watchman, did they?" Hernandez answered, "[n]o."

and unsafe." 345 S.W.3d at 156. The same cannot be said for this case. The evidence, however conflicting it may be,[8] includes at least a scintilla of evidence, penned by a JMI employee (Angelini) and reaffirmed in live in-court testimony by one of JMI's owners (Garcia), that JMI relied on a watchman as a fall-prevention measure. At one point, Hernandez lays the watchman responsibility on Raul Rodriguez. Moreover, the jury determined that Raul Rodriguez was a JMI employee, a finding that JMI does not challenge on appeal. Thus, as in *Lee Lewis Construction*, there is some evidence that JMI exercised actual control over the fall-prevention measures utilized by Medellin.

Therefore, JMI's sub-issue that challenges the legal sufficiency underlying Medellin's negligent-activity claim is overruled.[9]

## B. Alcohol and Marijuana Consumption

### 1. Standard of Review

Evidentiary rulings are committed to the trial court's sound discretion. *U-Haul Intern., Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012). An abuse of discretion occurs when the trial court acts without reference to any guiding rules and principles. *Bennet v. Grant*, 525 S.W.3d 642, 653 (Tex. 2017).

### 2. Excluded Evidence

At trial, JMI offered evidence of Medellin's consumption of alcohol and marijuana on the morning of the accident. Medellin objected on the grounds that such evidence was irrelevant and unfairly prejudicial. The trial court sustained Medellin's objections. Outside the jury's presence

---

[8] Raul Rodriguez testified that he did not request any worker to serve as a watchman.
[9] In light of our sustaining JMI's contention that the trial court reversibly erred in sustaining Medellin's objections to evidence that he consumed alcohol and marijuana before his fall, we need not address JMI's factual-sufficiency challenges because they would provide JMI with no greater relief. *See In re J.S.*, No. 09-08-00536-CV, 2009 WL 2045199, at *2 (Tex. App.—Beaumont Jul. 16, 2009, no pet.) (mem. op.).

and in an offer of proof, JMI offered the pretrial deposition testimony of Medellin, Luis Garcia, Hernandez, and Raul Rodriguez.

Medellin testified that, at 10:30 a.m. on the day of the incident, he had drunk one sixteen-ounce beer and smoked half a marijuana cigarette. Medellin stated that he drank and smoked because he believed that he was not going to be working that day. However, subsequently, Hernandez called Medellin and asked him to help at the Oaks Apartments. At the time, Medellin was at Sandoval Roofing waiting to receive his paycheck. Medellin agreed to assist Hernandez, but he did not inform Hernandez that he had consumed a beer and smoked marijuana. When asked "why did you go up onto the roof after drinking a beer," Medellin answered, "[b]ecause it was just one." The records from the hospital where Medellin received emergency medical treatment immediately following his accident indicated that he had a "baggy of some green leafy material" on his person.

Luis Garcia testified that he and his wife went to Sandoval Roofing before the incident to drop off paperwork. There, at sometime between 10:30 a.m. and noon, Garcia witnessed Medellin holding a beer. Garcia admitted that he drank a beer on the way to Sandoval Roofing, and, at some unspecified time, smoked a marijuana joint. Garcia, however, denied smoking marijuana with Medellin. Thereafter, Garcia, his wife, and Medellin drove to the Oaks Apartments, arriving at approximately 1:30 p.m.

Raul Rodriguez testified that he saw Medellin arrive at the Oaks Apartments with Garcia and Garcia's wife. Both Medellin and Garcia ascended to the roof and began working. However, when Raul Rodriguez approached Garcia, he noticed that Garcia had been drinking. Raul Rodriguez decided that it was not safe for Garcia to remain on the roof, and he "sent him down." Before Medellin fell, Raul Rodriguez did not suspect that Medellin was intoxicated or impaired because he was not stumbling, staggering, or slurring his speech. Raul Rodriguez witnessed

Medellin fall, recounting, "I turned around like this, and he was like this. When he pulls the roll, because he was dizzy; he was drunk; his body tips off, and he falls down." Raul Rodriguez descended from the roof, approached Medellin, and told him, "you should have told me that you were — you had been drinking." As Medellin was laying on the ground, Raul Rodriguez noticed that he smelled of alcohol and marijuana.

Hernandez, on examination by JMI, testified:

Q.   Well, I learned for the first time in talking to Mr. Medellin . . . that he had drank a Tallboy beer and smoked half a joint before going up on the roof at the Oaks on Bandera Apartments. Did you know that before he got up on the roof that morning?

A.   I was up on the roof when they got up there and I could smell him, you know; but that's regular. I mean, that smell, it's already — it's old. You know, it's old.

Q.   When you contacted Mr. Medellin that morning, you weren't — you didn't contact him about doing any work, did you?

A   No. He called me and said that they didn't work. [sic] I don't know if it was Sandoval or what company he was working for that day, but that they didn't work. [sic] If I wanted any help.

. . .

Q.   So when Mr. Medellin contacts you, did you ask him whether he had consumed any alcohol or smoked any marijuana?

A.   I don't need to. I don't need to ask him, you know. I mean, because when you smoke, you smoke, you know.

Q.   So when he showed up at the Oaks on Bandera job site, did you have an opportunity to assess him before he got up on the roof?

A.   No, we were up there already. So they went up there. They got up there.

. . .

Q.   Okay. Now, going back to the day of the incident, when you went and observed Mr. Medellin, did other individuals go down there to the ground as well such as Raul?

A. All of us.  All of — everybody got down.

Q. And at that point, did you realize that Mr. Medellin smelled of alcohol and of marijuana?

A. (Nodding head.)

MEDELLIN'S COUNSEL: Object to form.

Q. Is that when you first [sic] he had been drinking and smoking marijuana?

A. No, no.

MEDELLIN'S COUNSEL: Object to form.

A. — since before.  Since he got there.

Q. Oh, you knew when he got there?

A. Yeah.  But if you've been drinking the night before, I mean, you're still going to f------ stink like alcohol the whole following day, sometimes two days.

Q. And so did he smell of alcohol when —

A. No.

On cross-examination by Medellin, and tendered by him as rebuttal evidence in the offer of proof, Hernandez denied seeing Medellin stumble or slur his speech.  If Hernandez believed that Medellin was intoxicated, he would not have let him on the roof.

### 3. Analysis

JMI references *JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830 (Tex. 2018), as support for its contention that the trial court erred in sustaining Medellin's objection that evidence of his consumption of alcohol and marijuana was irrelevant and unduly prejudicial.  In *JBS*, a pedestrian died in a pedestrian-truck collision.  *Id*. at 833.  The incident was captured on a security video from a nearby store.  *Id*.  The decedent's family sued the trucking company.  *Id*.  At trial, the trucking company sought to admit evidence that the decedent had (1) alcohol, cocaine, and oxycodone

present in her body; (2) a "drug-type glass pipe" on her person; (3) a medical history of crack cocaine abuse; (4) been recently prescribed anxiety medications; and (5) been recently diagnosed with paranoid schizophrenia and bipolar disorder, for which she received two additional prescription medications. *Id*. at 834. A medical expert retained by the trucking company reviewed the security video and the decedent's medical history. *Id*. The expert opined that the various substances in the decedent's body impacted her cognition and that she was suffering from an acute exacerbation of her underlying mental disease at the time of the accident. *Id*. The trial court excluded all evidence of the decedent's mental health, prescription medications, and alcohol and drug use, including the expert's opinions, because it concluded that such evidence was prejudicial. *Id*.

In launching its analysis, the Texas Supreme emphasized that "*unfair* prejudice is the proper inquiry," and "'*[u]nfair* prejudice' within its context means an undue tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one." *Id*. (citation omitted). It noted that evidence that a party to an accident was intoxicated or impaired is not, in and of itself, evidence that the party acted negligently in relation to the accident. *Id*. at 836–37 (citation omitted). However, such evidence is probative if it is relevant to a party's actions in conforming or failing to conform to an appropriate standard of care. *Id*. at 837. In response to the decedent's family's argument that the expert did not opine that the decedent was "actually intoxicated or impaired," the court answered that "a specific showing of intoxication is not required in order for evidence regarding the use of substances to be admissible." *Id*. at 838.

Medellin argues that the trial court did nor err in sustaining his objection because JMI lacked evidence that Medellin was impaired or intoxicated and lacked testimony — from either an expert or layman — that his consumption was relevant to any alleged act of negligence. Medellin emphasizes the testimony from Raul Rodriguez, Hernandez, and Obiedo wherein they aver that,

before Medellin's fall, they did not witness Medellin either stumble or slur his speech. However, in recalling Medellin's fall, Raul Rodriguez also testified that, "I turned around like this, and he was like this. When he pulls the roll, because he was dizzy; he was drunk; his body tips off, and he falls down." Moreover, Medellin's coworkers testified regarding his consumption of alcohol and his odor of alcohol on the day the accident; Medellin acknowledged consuming a beer and marijuana on the morning of the accident; and Medellin was found with a baggy containing a substance resembling marijuana. These circumstances raise fact questions regarding Medellin's impairment or intoxication at the time of the accident. While prejudicial, we cannot say that this evidence is *unfairly* so; the evidence of Medellin's potential impairment is probative of his conforming or failing to conform to an appropriate standard of care. *Id*. at 836–37. As for Medellin's faulting JMI for lacking expert or lay testimony that his consumption was relevant to any alleged negligent act, the Texas Supreme Court has pronounced that "a specific showing of intoxication is not required in order for evidence regarding the use of substances to be admissible." *Id*. at 838. Accordingly, the trial court erred in sustaining Medellin's objection and excluding evidence that Medellin consumed alcohol and marijuana on the day of the incident.

Next, we address whether the error was harmless. *Id*. at 840. As in *JBS*, the first consideration — whether the excluded evidence was cumulative — does not support a conclusion that the exclusion was harmless. The trial court effectively excluded any mention of Medellin's consumption of alcohol and marijuana on the day of the incident. Therefore, the excluded evidence was not cumulative. Relatedly, the rest of the evidence strongly favored Medellin in that there was relatively little evidence supporting JMI's proportionate-liability defense.

The second consideration — whether the excluded evidence was crucial to a key issue — also does not support a conclusion that the exclusion was harmless. *JBS* articulates that "it is unquestionable that [the decedent's] state of mind and mental decision-making processes were

crucial to the key issue of whether her decision to walk into the street met the standard of reasonable care." *Id*. Medellin's ability to maintain his orientation while completing the project he and Reybel Rodriguez undertook was a key issue in assessing whether Medellin was negligent. Raul Rodriguez's testimony that Medellin appeared dizzy and his and Hernandez's recollection that Medellin smelled of alcohol and marijuana speak to whether Medellin acted as a person of ordinary prudence under the same or similar circumstances. Thus, the trial court's erroneous exclusion of the evidence probably caused the rendition of an improper judgment. We sustain JMI's sub-issue challenging the exclusion of evidence, and remand for a new trial consistent with this part of the opinion.[10]

### III. CONCLUSION

We reverse the trial court's judgment and remand for a new trial consistent with part II.B of this court's opinion.

Rebeca C. Martinez, Chief Justice

---

[10] In light of our disposition, we need not address JMI's remaining issues because they would not afford greater relief than already provided. *See* TEX. R. APP. P. 47.1; *see Emerson Elec. Co. v. Johnson*, 627 S.W.3d 197, 210 (Tex. 2021); *see also Pay and Save, Inc. v. Canales*, 04-20-00125-CV, 2022 WL 4227575, at *15 (Tex. App.—San Antonio Sep. 14, 2022, pet. filed) ("Because we will reverse the trial court's judgment and remand for a new trial on premises liability, we need not consider Pay and Save's challenges to the evidence supporting the jury's award of damages."); *Ballesteros v. Jones*, 985 S.W.2d 485, 500 (Tex. App.—San Antonio 1998, pet. denied) (en banc) ("We need not address [appellant's] remaining points concerning the sufficiency of the evidence to support the finding of gross negligence and the exemplary damages award because they are conditioned upon a finding of negligence.").