In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

NO. 09-21-00372-CV
_____

**CURTIS ADAIR D/B/A CK TRUCKING, Appellant**

**V.**

**TROY CHAPLA AND KELLY MANINGAS, INDIVIDUALLY AND
AS WRONGFUL DEATH BENEFICIARIES, AND ON BEHALF
OF THE ESTATE OF MARLEY CHAPLA, DECEASED, Appellees**

**On Appeal from the 258th District Court
San Jacinto County, Texas
Trial Cause No. CV14,958**

**MEMORANDUM OPINION**

This appeal arises from the trial of a wrongful-death suit filed following the collision of a small SUV traveling southbound on U.S. Highway 59 at over 90 miles per hour whose driver collided with a flatbed trailer when the trailer, which was being towed by a semi-tractor driven by Curtis Adair, was crossing the southbound lanes of

1

U.S. 59. Marley Chapla, the driver of the SUV and its only occupant, was traveling in the fast lane of the two southbound lanes on U.S. 59 when she struck the flatbed trailer. Her car hit the trailer in front of the trailer's back tires and based on the speed of the impact, the top of Marley's car and the area where Marley was sitting wedged beneath the trailer's frame. Marley suffered severe head injuries from the collision, was unconscious when seen inside the car after the collision occurred, and she died at the scene.

Following the collision, Marley's mother—Kelly Maningas—and her father—Troy Chapla—filed wrongful death claims for themselves together with a survival claim for Marley's estate against Curtis Adair d/b/a CK Trucking.[1] In the Plaintiffs' suit, the Plaintiffs alleged that Adair was negligent for failing to keep a proper lookout, failing to yield the right of way, driving while distracted by talking on his cell phone, blocking both lanes of travel on U.S. 59, turning across U.S. 59 when it wasn't safe to do so without stopping to make sure it was safe to proceed, operating a commercial vehicle without proper training, failing

---

[1] Adair operated his truck under an assumed name, CK Trucking.

2

to have a policy against talking on a cell phone while operating a commercial vehicle, failing to maintain proper control of his vehicle, and failing to familiarize himself with the information and training needed to safely maintain and operate his 18-wheeler on a Texas highway. The Plaintiffs also alleged that Adair's acts or omissions proximately caused the collision, Marley's injuries, and Marley's death.

Fourteen witnesses were called to testify in the trial, six by the Plaintiffs and eight by the Defendant. In a 10-2 verdict, the jury found that Adair and Marley were negligent and that the negligence of both proximately caused Marley's death. The jury then assigned 75% of the responsibility for Marley's death to Adair and assigned the rest, 25%, to Marley.

Turning to the Plaintiffs' statutory wrongful death actions, the jury awarded damages of nine million dollars.[2] On the Estate's survival

---

[2]*See* Tex. Civ. Prac. & Rem. Code Ann. §§ 71.002, 71.004, 71.010. The jury awarded $500,000 to each parent for loss of companionship and society sustained in the past, $1,000,000 to each parent for loss of companionship and society sustained in the future, $2,000,000 to each parent for mental anguish sustained in the past, and $1,000,000 to each parent for mental anguish sustained in the future.

statute claim, the jury awarded one million dollars for the mental anguish that Marley suffered before she died.[3]

After the trial court reduced the statutory awards to account for Marley's comparative fault, the trial court signed a judgment ordering Adair to pay damages of $6,750,000 on the parents' wrongful death claims. As to the Estate's survival action, the judgment awards Marley's Estate damages of $750,000.

After the trial court signed the judgment, Adair timely filed an appeal. Adair raises six issues in his appellate brief. In his first issue, Adair contends the trial court erred in excluding the evidence that he wanted to introduce to show the collision was caused because Marley was driving while impaired by the alcohol she had consumed before driving to work. According to Adair, by depriving him of the testimony he wanted to present from his toxicologist, Dr. Michael Holland, he wasn't allowed to explain that the blood-alcohol content in Marley's body when the collision occurred was sufficient to impair "her ability to safely operate her vehicle." Adair contends that excluding Dr. Holland's

---

[3]*See id*. § 71.021.

4

testimony was harmful because the evidence was crucial to a key issue—the comparative fault of the parties in causing the collision. Adair claims that the jury's assignment of the percentages of fault for causing the collision would have been different had the trial court allowed the jury to consider Dr. Holland's testimony.

In Adair's last five issues—issues two through six—Adair argues the trial court erred in 1) excluding the toxicology report and Dr. Holland's testimony that Marley's consumption of marijuana impaired her driving; 2) limiting the testimony of Kelley Adamson—his expert on accident reconstruction—to the opinions Adamson disclosed in his report; 3) allowing the Plaintiffs' safety/compliance expert (Roger Allen) to testify that Adair violated various trucking regulations when the parties and their experts "agreed that the alleged violations did not cause the accident;" 4) rendering judgment for the Estate on factually insufficient evidence to support an award of one million dollars in non-economic damages; and 5) issuing a judgment on Marley's parents' wrongful-death claims on "evidence factually insufficient to support the jury's award of $9 million in non-economic damages[.]"

Because we conclude that Adair's first issue is dispositive and that addressing his remaining issues would afford Adair no more relief, we do not reach Adair's last five issues.[4] We conclude the trial court abused its discretion in finding that Dr. Holland's testimony wasn't relevant and in finding that Dr. Holland's testimony was more prejudicial than probative to the issues in dispute. We also conclude the trial court's error in excluding the toxicology report and Dr. Holland's testimony about the extent to which Marley's driving was impaired by her consumption of alcohol before the wreck occurred was harmful. For these reasons, we sustain Adair's first issue, reverse the trial court's judgment, and remand the case to the trial court for further proceedings consistent with the opinion.

## Background

Our discussion is limited to the evidence necessary to resolve Adair's first issue.

The wreck that resulted in the filing of the suit occurred on April 11, 2017, around 8:30 a.m. Adair was driving a semi-tractor and towing

---

[4]Tex. R. App. P. 47.1.

a flatbed-trailer, a rig that was around 67 feet long. Adair was northbound on U.S. Highway 59 when he used a turning lane on the northbound side of the highway and entered a median crossover that separates the northbound and southbound lanes. After he turned into the median crossover, he continued across the southbound lanes of U.S. 59 and intended to enter State Highway Loop 116, to proceed on his route to a business that was storing the materials he was planning to load on the flatbed trailer. As Adair was crossing the southbound lanes of U.S. 59, Marley's small SUV struck his flatbed trailer in front of the trailer's rear tires. The wreck occurred about seven miles north of Livingston, Texas.

At trial, Adair testified he saw only one vehicle, a Chevy Blazer, when he checked the southbound lanes of U.S. 59 before he began to cross the southbound lanes of U.S. 59. At trial the driver of the Blazer, Kimberly Schleppi, testified that she was in the right-hand southbound land of the highway and driving slowly at a speed of less than 15 miles per hour when she saw a semi-truck "going across U.S. 59."

At trial, it was undisputed that a Ford Expedition, driven by Jason Cooley, was also southbound on U.S. 59 and behind Schleppi's

Blazer when Adair began to cross the highway. Cooley also testified in the trial. According to Cooley, he was traveling 75 miles per hour when he saw Adair's truck. Cooley testified that when he saw Adair cross the southbound lanes of U.S. 59, he "let off the gas to - - because I felt like - - I didn't think he had enough time." Cooley explained that after he slowed down, a car traveling in the inside lane on U.S. 59 passed his Expedition and hit the flatbed trailer. According to Cooley, when the SUV went by him, he remembered thinking: "'Please stop,' or something. I don't know if [the driver in the SUV] didn't see the – the truck – or the 18-wheeler or what. And she hit the back wheels of the - - the trailer part of the 18-wheeler." That said, Cooley agreed that when he saw the semi-truck, he slowed down by letting off the gas, didn't hit his brakes, pulled onto the shoulder of the highway, and he stopped. After the SUV crashed into the 18-wheeler, Cooley ran up to the vehicle that had wrecked. According to Cooley, when he got to the SUV nothing could be done.

Marley Chapla, the driver of the SUV, didn't survive the impact from the wreck. In the wrongful death and survival suit filed by Marley's parents, Troy Chapla and Kelly Maningas alleged that Adair's

8

negligence in failing to operate his semi-truck under the applicable standards of ordinary care proximately caused Marley's death. Among other things, the Plaintiffs alleged that Adair failed to keep a proper lookout and to yield the right-of-way to oncoming traffic when he crossed U.S. 59, a 75-mile-an-hour highway.

In response to the Plaintiffs' petition, Adair answered and denied he was negligent. Adair also alleged that Marley's failure to exercise ordinary care caused the collision. When Adair responded to the Plaintiffs' requests for disclosure, he claimed that Marley failed to keep a proper lookout, had been traveling at a speed above the posted speed limit, failed to timely apply her brakes, had been driving when she was impaired, did not act in an appropriate manner to avoid the collision, failed to control her vehicle, and was driving while distracted because she was on her phone.

In presenting their case, Plaintiffs obtained testimony from Adair who agreed that before he began crossing U.S. Highway 59, he didn't look for southbound traffic that would have been traveling fifteen seconds from where he was crossing the highway. He also agreed that he saw only one vehicle before he crossed the highway, the Blazer, and

that he didn't see the Ford Expedition or Marley's SUV. Adair testified that he was willing to accept his fair share of the responsibility for the wreck, and Adair agreed he didn't have a "good excuse" for failing to see the Ford Expedition or Marley's SUV.

Plaintiffs also presented testimony from Roger Allen, who testified as the Plaintiffs' expert on motor-carrier safety and accident causation. Allen testified that Adair breached the standard of care that applies to commercial truck drivers by failing to yield the right-of-way to oncoming traffic. According to Allen, commercial truck drivers are governed by federal motor carrier safety standards, and in his opinion, Adair was operating his truck in violation of those standards when the collision occurred. Allen also testified that in his opinion, Adair failed to conduct a proper visual search before deciding to cross the highway, which required that Adair determine whether a safe gap in the southbound traffic existed before he began to cross. Allen added that when Adair began to cross U.S. 59, other drivers in the southbound lane were required "to take evasive action to stop[,]" which Allen said included Cooley's action in letting off the gas.

10

In presenting his case-in-chief, Adair presented the accounts of the eyewitnesses to the wreck (other than his own) through the video depositions that his attorney obtained from the four witnesses that Marley passed before the collision occurred, Kimberly Schleppi, Jennifer Gaddis (the passenger in Schleppi's Blazer), Jason Cooley, and Jennifer Cooley (the passenger in Jason's Expedition). Kimberly Schleppi, who was driving the Blazer, testified that Marley's SUV "came out of nowhere," "flew by," and crashed into the tractor-trailer. Jennifer Gaddis, a passenger in the Blazer, testified that when Marley's SUV passed them, she watched the SUV's driver in the next five seconds "bend down to change a radio station, pick up her phone[,] or something. But just from here to there, she – that's all she needed, just to look up." According to Gaddis, when the wreck occurred the driver of the SUV "was looking down, and that was it. That's how - - how - - how she - - she died."

Jason Cooley, the driver of the Ford Expedition, testified that he saw Adair's truck enter the median, hesitate for a second, and then continue across the median and into the southbound lanes. Jason testified that he was traveling 75 miles per hour when he saw Adair's

11

truck, which was "right there at the median, going to cross over[.]" Jason explained that when he saw that Adair would cross the southbound lanes of the highway, he didn't believe Adair had sufficient time for his truck and trailer to clear the southbound lanes. So, Cooley said that when he saw the truck planned to cross the highway, he "let off the gas to - - because I felt like - - I didn't think he had enough time." Cooley explained that after letting off the gas, an SUV in the inside lane passed his Expedition and hit the flatbed trailer. At trial, Jason testified that when the SUV went by him, he remembered thinking:

> 'Please stop,' or something. I don't know if [the driver in the SUV that passed him] didn't see the – the truck – of the 18-wheeler or what. And she hit the back wheels of the - - the trailer part of the 18-wheeler.

That said, Jason agreed that although he slowed down by letting off the gas, he agreed that he didn't hit his brakes. Jason also testified that he saw the wreck, pulled on the shoulder of the highway, and stopped. Jason testified that he then ran to the vehicle that hit the trailer, but when he got there, he decided there wasn't anything he could do for the driver in the SUV.

12

Jennifer Cooley testified that she saw Marley's SUV pass them using the left lane on U.S. 59. According to Jennifer, Marley's SUV was going "pretty fast" when it passed the Expedition, and she estimated that the SUV was traveling at a speed higher than the posted limit. Jennifer also testified that after Marley passed them, she is certain no brake lights on the SUV came on because "it was like she never even seen it. You know, maybe she was looking at her phone or - - something like that. And she just never let off the gas or anything." Jennifer also testified that she never saw Marley's SUV move to the left or the right before the collision occurred. Unlike Jason, Jennifer testified she recalled that Jason "was able to get off the gas, you know, tap the brakes; and I think he slammed on them once."

Adair also presented the testimony of Corporal Ramey Bass, the highway patrolman employed by the Texas Department of Public Safety who oversaw the investigation conducted by the Department of Public Safety into the wreck. Corporal Bass's testimony was presented to the jury through his videotaped deposition. When Corporal Bass testified, he explained that he and other officers who assisted him gathered and photographed the physical evidence at the scene the day the collision

13

occurred. Based on what Corporal Bass said that he saw on the scene, he determined "that the SUV was traveling southbound on U.S. 59 and struck the trailer as it was crossing U.S. 59[,] . . . [r]ight between the last two [rear] axles." Corporal Bass also testified "there were no skid marks prior to impact" made by the SUV from what he saw on the highway at the scene, except for "drag marks or yaw marks" that according to Corporal Bass were left on the highway after the SUV became lodged under the trailer and it was subsequently "dragged off the highway" after the impact occurred.

Corporal Bass testified that while at the scene, he interviewed Adair and took statements from two witnesses who saw the collision when it occurred. He explained that he was also present when the electronic control module (the ECM or black box) was removed from Marley's SUV. According to Corporal Bass, the data from the black box from Marley's SUV shows that five seconds before the crash, her car was traveling at 92.58 miles per hour. Bass testified that in his opinion, had Marley not been speeding above the posted speed limit of 75 miles per hour, "she could have avoided the crash." Bass also testified that in

14

his opinion, Adair's failure to yield the right-of-way to the southbound traffic on U.S. 59 was a contributing cause to the collision.

Along with Corporal Bass's testimony about his investigation, the trial court admitted a redacted copy of the Texas Peace Officer's Crash Report, which Corporal Bass prepared after he investigated the collision. Before admitting the Officer's Crash Report, the trial court required Adair's attorney to redact information in it showing that Bass determined that Marley had alcohol and marijuana in her system and that Corporal Bass determined that Marley's ingestion of these substances may have contributed to the crash.

Adair also called Kelley Adamson, a licensed professional civil engineer, to reconstruct the crash and to express opinions about its cause. Adamson testified that he has worked in the field of accident reconstruction since 1983 and is certified in the field by the Accreditation Commission for Traffic Accident Reconstructionist (ACTAR). Adamson testified that based on his investigation of the collision, Marley could have avoided the collision had she been driving at 75 miles per hour. Based on the data from the black box, which shows the speeds at which Marley's SUV was traveling at various times

15

during the five-second period before she hit the trailer, Adamson explained that Marley was coasting when she began an "initial phase of the braking" at 2.1 seconds from impact. Adamson testified the data from the black box also shows that when Marley was "1.5 seconds" from the impact, she "go[es] to full brakes." Relying on the data from the black box, Adamson explained that in his opinion Marley had a delay in her perception and reaction to Adair's truck crossing the southbound lanes of U.S. 59. Adamson agreed with the statement of Adair's attorney that "there are a lot of things that can cause a delay in perception and reaction[.]" That said, Adair was not allowed to present Dr. Holland's testimony explaining that the delays in reaction and perception were attributable to Marley's consumption of alcohol.

Adamson also described why delays in perception and reaction would have affected the outcome of the collision and severity of the impact. According to Adamson, at a speed of 92.6 miles per hour, Marley's stopping distance would have been 397 feet. In contrast, at a speed of 75 miles per hour, her stopping distance would have been 260 feet. According to Adamson, had Marley been traveling at 75 miles per hour, she needed "to barely slow down to allow the tractor-trailer to get

out of the way." Even then, Adamson explained the higher that Marley's speed was on impact, the lower the probability would have been "of surviving an accident."

Adamson also explained that a driver needs to have the normal use of their faculties to have a normal ability to perceive and to react to the hazards of driving. According to Adamson, fatigue may cause a person to have a delayed reaction to a hazard.

The jury heard testimony that Marley was headed to work the morning the collision occurred. The jury also heard testimony that Marley had attended a birthday party the night before the wreck, but the jury didn't hear any testimony that Marely had consumed any alcoholic beverages that evening because evidence about alcohol was excluded from the trial. Testimony from Marley's boyfriend, Nana Yeboah, established that the morning the wreck occurred, Marley left her apartment to drive to work, which was approximately a two- and one-half-hour drive from his apartment. The jury heard conflicting testimony from Nana and Nana's friend, Kelechi "K.C." Joel, about what time Marley had gone to bed the night before the wreck occurred. Nana testified that Marley went to bed at 10:00 or 11:00 p.m. the night

before the wreck occurred. K.C., however, testified that Marley came to his and Nana's apartment around 9:00 or 10:00, and she "[w]ent to bed" around midnight. Marley's friend, Chelsie Miller, testified that she was with Marley, Nana, and KC the night before the wreck celebrating K.C.'s birthday. Chelsie explained that since they had stayed up late and Marley had to drive to work the next day, she was concerned about how much rest Marley had gotten that night before she left Nana's apartment to drive to work.

Plaintiffs presented testimony from another witness, Benton Randle, who investigated the collision after it occurred and testified that, in his opinion Adair's failure to wait to cross the highway until he had sufficient time to cross caused the wreck.[5] Randle explained that his investigation of the collision included gathering the facts about the wreck, which included the data downloaded from the black box that was in Marley's SUV. Randle testified that based on his investigation and

___

[5]In an affidavit that Randle signed in response to a motion seeking to limit his testimony, Randle states that he has a Bachelor of Science in Civil Engineering and that he has "been engaged in the practice of accident reconstruction for the last 10 years." At trial, Randle testified that he is not a licensed professional engineer.

considering "the time she was - - that she had out here, that 4 seconds to impact . . . there's just not enough time outside of the 2 and a half seconds she was braking to be critical of her." As to Marley's reaction to Adair's truck crossing the highway, Randle stated that Marley's reaction was "right in line with where you would expect it to be and it's - - it's a normal reaction time, that 1.5 seconds[.]" Simply put, it was Randle's opinion that Marley had four seconds to perceive and react to Adair's tractor-trailer crossing the highway before she hit his trailer, that Marley engaged her brake 2.5 seconds before impact, and that Marley had a perception-reaction time before she hit her brakes of 1.5 seconds. According to Randle, Marley reacted promptly to the tractor-trailer's crossing the highway, and "there's no way to be critical of [Marley's] attention level" in assessing her negligence. Randle testified "there's no way to conclude that she wasn't paying attention because the download shows she was braking." But as to Adair, Randle stated that because Adair impeded the flow of traffic on U.S. 59, "Marley was killed as a result of that turn."

We turn next to the evidence that the trial court excluded that is the subject of Adair's first issue, specifically the evidence about the

19

alcohol in Marley's system and the testimony about whether it, in the opinion of Adair's toxicologist, would have affected Marley's perception and reaction to a hazard such as Adair's truck crossing the highway. According to Adair, the evidence about whether Marley had the normal use of her faculties when the collision occurred was relevant to an issue of material fact, specifically whether Marley perceived and reacted within a normal period to seeing Adair crossing the highway before the collision occurred. Adair argues he was harmed by the trial court's ruling excluding Dr. Holland's testimony and the toxicology report, which shows that a specimen of Marley's blood, tested the day after the collision, was positive for the presence of alcohol. According to Dr. Holland, the blood-alcohol level in the specimen tested was sufficient to have caused a driver's normal perception and reaction to a hazard to have been impaired. The toxicology report shows that Marley's blood specimen tested positive for ethanol, and that her blood-alcohol content based on the testing of the specimen was .055%, or 55mg/dL.

Before Adair rested, the trial court allowed Adair's attorney to make an offer of proof relating to the substances found in the toxicology report that could have impaired Marley's ability to drive a car. In the

proffer, Adair's attorney told the trial court that Adair wanted to introduce evidence based on the toxicology report showing that Marley had alcohol in her system when the wreck occurred. Adair's attorney explained that he intended to call Dr. Michael Holland, a toxicologist, to show "there's a reasonable degree of medical and scientific certainty that Marley Chapla was impaired at the time of the accident. This is one possible explanation for her delayed and/or improper reaction to the hazard." Adair's attorney added that he also wanted to call Kelley Adamson, who testified in the trial as an expert on accident reconstruction, to testify that in his opinion the alcohol in Marley's system would explain Marley's delayed reaction to the hazard of Adair's truck crossing the highway based on the level of impairment testified to by Dr. Holland and Dr. Holland's report. The trial court denied Adair's request.[6]

---

[6]Adair's attorney marked and offered Adamson's report as an exhibit to support his bill of proof. Adamson's report, which was marked as Exhibit 194, is in the appellate record. It states: "The toxicology report indicates levels of Ethanol and THC in Ms. Chapla's system at the time of the accident. According to Dr. Michael Holland there is a reasonable degree of medical and scientific certainty that Ms. Chapla was impaired at the time of the accident. This is one possible

21

Besides making an oral proffer, Adair's attorney presented the trial court with an affidavit signed by Michael G. Holland supporting his proffer. Dr. Holland's report reflects that he is board certified in five fields, (1) Toxicology, (2) Emergency Medicine, (3) Occupational Medicine, (4) Undersea and Hyperbaric Medicine, and (5) Addiction Medicine. He is a faculty member of the Medical Toxicology Fellowship Training Program, a program in which he teaches medical students, residents, and pharmacy students subjects in the field of toxicology covering drug and alcohol intoxication, abuse, overdose, and impairment. In his report, Dr. Holland explained that based on medical science, it has been conclusively established that at a blood-alcohol concentration of .055 mg/dL an "impairment from alcohol begins at BAC's lower than Marley Chapla's." Dr. Holland's affidavit shows that he reviewed Marley's autopsy report, the toxicology report that was based on specimens collected during her autopsy, and Kelley Adamson's

explanation for her delayed and/or improper reaction to the hazard." At page nine of Adamson's report, he states that he considered "Ms. Chapla's excessive speed [] the primary contributing factor to the accident and her delayed heavy braking application [] a contributing factor."

22

report. His affidavit lists the various effects documented by the Center for Disease Control for individuals with BAC levels like Marley's, effects that include:

- Exaggerated behavior,
- May have loss of small-muscle control (e.g., focusing eyes),
- Impaired judgment,
- Lowered alertness,
- Release of inhibition,
- Reduced coordination,
- Reduced ability to track moving objects,
- Difficulty steering,
- Reduced response to emergency driving situations, and
- Slowing of perception and reaction.

Dr. Holland states in his affidavit that in his opinion, "Marley Chapla experienced a level of impairment at the time of the accident from consumption of alcohol." According to Dr. Holland's affidavit, the ethanol concentration in Marley's vitreous fluid based on her autopsy allowed him to state with "a high degree of confidence and reasonable certainty that Marley Chapla's antemortem blood alcohol concentration ("BAC") was 0.055 g% (g/dL) at the time of the accident." As Dr. Holland put it, "[Marley] was impaired by the alcohol in her system at the time of the accident[,]" and she didn't have "the normal use of her mental and physical faculties."

The appellate record shows that even before the trial, the trial court was familiar with the evidence tied to the dispute that existed between the parties over the admissibility of Dr. Holland's testimony. In pretrial proceedings on "Plaintiffs' Motion to Exclude Evidence Regarding [Marley's] Post-Accident Drug and Alcohol Tests and Motion to Exclude Defendant's Toxicology Expert," a motion the trial court granted, Adair argued that Dr. Holland's testimony and the toxicology report were relevant to the jury's determining whether Marley's negligence had contributed to the wreck. In Adair's response to the Plaintiffs' motion to exclude Dr. Holland's testimony, Adair included Dr. Holland's affidavit, which has already been discussed, along with Dr. Holland's seventeen-page report, which is dated August 22, 2017. In the report, Dr. Holland provides even more detail about the role that the alcohol in Marley's system played in causing her ability to drive normally to be impaired. For example, Dr. Holland's report states: "Ms. Marley Chapla's postmortem toxicology report indicated the concomitant presence of ethanol at 0.055 g%, an[] amount known to be impairing for skills necessary for safe driving." His report states that in his opinion, and within "a reasonable degree of medical [and] scientific

certainty, . . . Marley Chapla was impaired by alcohol and marijuana when she was speeding at 92 mph, 17 mph over the speed limit, and crashed her car into the truck without taking any timely evasive action to avoid the collision[.]"

In its order excluding the evidence, the trial court found: "There is no suggestion in the record that Ms. Chapla's reaction time was negligent, related to causation, or deviated from a relevant standard of care." The trial court excluded the evidence under Rule of Evidence 403, stating that in its view, the evidence had "very little probative value" when compared to the danger the evidence could "invite emotional responses by evoking the harm caused by *intoxicated* drivers—which Ms. Chapla was not."[7] In its order, the trial court stated that in the court's view, admitting the evidence would "likely confuse the issues and mislead the jury by suggesting Ms. Chapla's alleged impairment could serve as substitute for, or be considered together with, Defendant's viable contributory negligence theories." From the trial court's standpoint, the jury could understand how Marley's decision to

---

[7]Emphasis in the trial court's order.

25

speed factored into the collision, but the court ruled that it would be too confusing, misleading, or prejudicial to allow the jury to consider if something else—an impairment to Marley's driving caused by the alcohol in her system—explained why Marley drove her car in the manner the witnesses and the data from the black box describe.

The trial court excluded the evidence tied to the toxicology report and excluded Dr. Holland's testimony relying on the report, which would have exposed the jury to Dr. Holland's opinion that the alcohol level in Marley's blood deprived her of the normal use of her mental and physical faculties. So, the jury was not allowed to consider evidence directly related to causation and the jury's apportionment of Marley's fault. For instance, during final argument the Plaintiffs' attorney acknowledged that Marley's speeding was a cause of the wreck. Yet, the Plaintiffs' attorney was allowed to argue that there was no evidence proving that Marley had been inattentive in the five seconds before the wreck occurred. According to the Plaintiffs' attorney, Adair's contention that Marley had been inattentive was "another frivolous defense because we know from the download that at that point in time[,] Marley

26

is hard on her brakes when she passed and before she passed [Kimberly Schleppi's Blazer]."

For his part, Adair's attorney—limited by the rulings made by the trial court excluding the evidence from the record—argued to the jury that Marley's speed, inattentiveness, and fatigue on her part were what had caused the collision:

> Remember, of course, she's not paying attention. She's potentially fatigued, and it's compromised her mental or physical faculties. It could of course be the speed itself; but the speed is certainly a huge element that causes the accident. The three things went together: Speed, inattention, and fatigue.

To support his argument that Marley was inattentive, Adair's attorney pointed to Corporal Bass's testimony that he found Marley's cell phone in her lap in the investigation he conducted the day of the collision. Adair's attorney also noted that Jennifer Gaddis's testimony (the passenger in the Blazer) suggested that when Marley was approaching Adair's truck, she might not have seen him because Gaddis saw Marley bent down, suggesting that Marley perhaps might have been changing the radio or picking up something she dropped. Still, Adair's attorney agreed that Adair was at fault for crossing the

southbound lanes of the highway when he didn't have sufficient time to go across, and the attorney argued that the jury could assign 25 to 33% of the fault for the collision to Adair while assigning what was left to Marley. When the jury returned with a verdict, it found both parties negligent, assigned 75% of the fault to Adair, and found the fault that remained, 25%, belonged to Marley.

Following the trial, Adair timely filed a motion for new trial and an amended motion for new trial. These motions were never ruled on, so they are deemed to have been overruled by operation of law.[8] In November 2021, Adair timely filed a notice of appeal.

## Standard of Review

We review a trial court's ruling excluding evidence for abuse of discretion.[9] "If a trial court abuses its discretion and erroneously excludes evidence, the question is whether the error 'probably caused the rendition of an improper judgment.'"[10] "That standard does not require the complaining party to prove that but for the exclusion of

[8]Tex. R. Civ. P. 329(c), (e).

[9]*JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830, 836 (Tex. 2018); *Caffe Ribs, Inc. v. State*, 487 S.W.3d 137, 142 (Tex. 2016).

[10]*JBS Carriers*, 564 S.W.3d at 836 (citing Tex. R. App. P. 61.1(a)).

evidence, a different judgment would necessarily have resulted."[11] "Rather, if erroneously excluded evidence was crucial to a key issue, then the error was likely harmful—that is, it probably caused the rendition of an improper judgment—unless the evidence was cumulative or the rest of the evidence was so one-sided that the error likely made no difference in the judgment."[12] In an intermediate appellate court, the appellant must establish that an error by a trial court in excluding evidence "probably caused the rendition of an improper judgment" to obtain a reversal of the judgment on appeal.[13]

## Analysis

In issue one, Adair argues the trial court erred in excluding evidence that he would have introduced to show that Marley's fault in the collision included that she was driving while impaired by the alcohol she had consumed before the collision occurred. On appeal, Adair argues the evidence that Marley was driving while impaired by the alcohol in her system was relevant to key issues that were

---

[11]*Id*. (cleaned up).
[12]*Id*. (cleaned up).
[13]Tex. R. App. P. 44.1(a)(1).

29

disputed—Marley's negligence and her percentage of the apportioned fault. Adair also argues the evidence that Marley was impaired by the alcohol she had in her system was more probative than prejudicial, and if introduced the evidence would not have been unduly prejudicial, confusing, misleading, or cumulative since it offered an alternative to the account the Plaintiffs offered in the trial—that Marley's speeding was all that she did wrong—to account for Marley's fault. Adair further argues that the trial court's error in refusing to allow Dr. Holland to testify merits a ruling by this Court reversing the judgment because the evidence the trial court excluded was crucial to the key issues in the case—issues of fact that involved Marley's negligence, what caused the collision, what caused Marley's death, and the jury's assessment of the parties' proportionate fault.

1. *Was the evidence relevant?*

Relevant evidence is presumed to be admissible at trial.[14] Rule 401 defines relevant evidence as evidence that has any tendency to make the existence of any consequential fact more or less probable than it

---

[14]Tex. R. Evid. 402.

would be without the evidence.[15] Still, "[e]vidence that a party to an accident was intoxicated or impaired is not, in and of itself, evidence that the party acted negligently in relation to the accident."[16] But "such evidence is probative if it is relevant to a party's actions in conforming or failing to conform to an appropriate standard of care."[17]

Under Texas law, it is settled "that evidence of a party's use of impairing substances is admissible if the evidence raises a question about why the party acted as he or she did in connection with the occurrence."[18] The Texas Supreme Court has explained that when the evidence raises a question about why the party acted as they did in connection with a collision and the driver's control of their vehicle is a key issue in the case, the evidence tying the driver's control of their vehicle to an impairing substance like alcohol is admissible.[19] Even

---

[15]*Id*. 401.

[16]*JBS Carriers*, 564 S.W.3d at 836-37 (citations omitted).

[17]*Id*. at 837 (citing *Nichols v. Howard Trucking Co., Inc.*, 839 S.W.2d 155, 157-58 (Tex. App.—Beaumont 1992, no writ)) (trial court did not err by admitting evidence of a drug screen offered on intoxication issue to explain why the driver of a vehicle crossed the center line and caused the collision).

[18]*Id*.

[19]*Id*. at 838.

when the evidence doesn't rise to a level sufficient to show that a driver was legally intoxicated, evidence that a driver was impaired by a substance is still admissible if it answers a question about why the party acted as they did since under Texas law, "a specific showing of intoxication is not required in order for evidence regarding the use of substances to be admissible."[20]

Turning to the evidence (which the trial court excluded) of Marley's impairment, the Plaintiffs argue that no evidence links the results of Marley's alcohol consumption to her actions. According to the Plaintiffs, Marley's BAC "was below the legal limit and there was no evidence that the alcohol consumption [] either a) delayed Marley's reaction time; or b) that any delayed reaction time caused or contributed to the crash." But the Plaintiffs argument that the defendant failed to link Marley's consumption of alcohol to her actions is premised on the Plaintiffs' theory that the collision was unavoidable given Marley's high rate of speed when Adair's truck started to cross U.S. 59. In the alternative, they argue that "even were there some

---

[20]*Id.*

evidence to support the delayed-reaction-time theory, Adair's accident reconstructionist established that quicker braking would not have saved Marley's life."[21]

We disagree. Dr. Holland's report along with the toxicology report links Marley's alcohol consumption to a theory or explanation that the jury in deciding whether to accept Dr. Holland's opinions was entitled to consider if his opinions explained why Marley was driving her car at a high rate of speed, why she failed to apply her brakes or slow down sooner than she did, and whether the outcome of the collision would

---

[21]Kelley Adamson is the witness who testified as Adair's expert witness in reconstructing the collision. We disagree that Adamson testified or suggested that even at an initial speed of 92.6 miles per hour, Marley would have been killed if she had seen, perceived, and reacted within a normal period to the truck's crossing the southbound lanes of U.S. 59. Rather, his testimony suggests that had she seen, perceived, and reacted within a normal time at an initial speed of 92.6 miles per hour, her car would have hit the trailer further toward the rear of the trailer than it did and at a lower speed. Thus, even though at an initial speed of 92.6 miles per hour, it was Adamson's opinion that at five seconds from the trailer the collision would have occurred if she was traveling at 92.6 miles per hour when she was five seconds from the trailer, he never testified that had Marley been traveling at a lower speed when her car was five seconds from the trailer or if she had applied her brakes sooner at a speed of 92.6 miles per hour than she did, which according to Adamson would have resulted in an impact further back on the trailer, that Marley would have been killed.

have been changed had she had the normal use of her faculties the day the collision occurred.[22]

The evidence Adair presented in his proffer shows that the judgment and ability to drive of individuals with BACs lower than the level in Marley's specimen may impair a driver's ability to perceive, react, and stay fully alert. Dr. Holland's report ties the level of alcohol found in Marley's specimen to his opinion that Marley was driving while impaired. His report states, Marley "was impaired by the alcohol in her system at the time of the accident[,]" and she "did not have [] the normal use of her mental and physical faculties because of the introduction of alcohol into her body." In the affidavit, Dr. Holland asserted there "is a direct relationship between the impairment at BAC levels equivalent to Marley Chapla's value and motor vehicle accidents."

According to the Plaintiffs, no link exists between the BAC level in Marley's specimen and the speed at which Marley was traveling on U.S. 59, 92.6 miles per hour, just five seconds before the wreck. We disagree. In our opinion, the jury had the right to agree or disagree with Dr.

---

[22]Tex. R. Evid. 401.

34

Holland that the BAC level in Marley's blood specimen explained her loss of judgment based on his opinion that Marley was an impaired driver, the information in his affidavit, and his testimony in the pretrial hearing that drivers who are impaired by alcohol may "drive too fast and recklessly."

The order the trial court signed granting the Plaintiffs' motion to exclude Adair's evidence of Marley's BAC level and its effects reflects that the trial court found there was "no evidence suggest[ing] that Ms. Chapla's reaction time caused the wreck." But the trial court's finding ignores Dr. Holland's affidavit, his proffered testimony in the pretrial hearing, and the ruling excluding the evidence about the alcohol allowed the Plaintiffs to present an incomplete picture to the jury about the role that Marley's fault played in contributing to cause the collision and her death. In deciding whether Adair tied Marley's consumption of alcohol to Marley's actions, the trial court should have considered whether Marley's ingestion of alcohol before the wreck helped explain disputed issues of fact as the effects of the alcohol as described by Dr. Holland relates to the way Marley was driving her car when the wreck

35

occurred.[23] In this case, Adair's proffer shows the effects of alcohol at a level consistent with Marley's would have helped explain whether Marley's judgments to drive her car at a high rate of speed, in timely perceiving the hazard involving Adair's truck, and reacting to the hazard in time to slow her car are all matters affected by the alcohol Marley had ingested, according to Dr. Holland. In other words, evidence of Marley's ingestion of alcohol and BAC, had that evidence been admitted would have offered the jury an alternative explanation for Marley's speeding, an explanation that differed from the explanation that Marley was rushing to get to work. The evidence about an impairment from alcohol at a level consistent with Marley's also fits Adair's claim that she was inattentive to the hazards of other traffic on the highway like his truck, his claim that she should have slowed when he began crossing the highway sooner than she did, and his claim that she should have seen, perceived, and reacted to his crossing the highway by braking more quickly.[24]

_____

[23]*See JBS Carriers*, 564 S.W.3d at 836.
[24]*Id*. at 836-37.

Dr. Holland supported his opinion that Marley's judgment was affected by the alcohol with a chart from the Center for Disease Control and Prevention. The CDCP chart shows the impairing effects of alcohol on a person's judgment are typical at .02% BAC, a level less than half that found on the test performed during an autopsy on a specimen of Marley's blood obtained postmortem. The chart from the CDCP also provides support for Dr. Holland's opinion that the effects of alcohol at levels lower than the level in Marley's system align with delays in a driver's reaction, perception, and a driver's inattentiveness. Accordingly, Dr. Holland's testimony had it been admitted would have supported Adair's defense.

As to relevance, the question is whether the evidence of the effects of the alcohol would have had any tendency to make a fact of consequence more or less probable than it would have been without the evidence.[25] In a collision where the drivers of both vehicles involved were at fault, the jury must answer an issue that resolves the factual dispute about the extent to which each party caused or contributed "to

---

[25]Tex. R. Evid. 401.

cause in any way the harm for which recovery of damages is sought, whether by negligent act or omission, by any defective or unreasonably dangerous product, or by other conduct or activity that violates an applicable legal standard, or by any combination of these[.]"[26]

In the charge the trial court submitted, the trial court asked the jury to decide the percentage of responsibility attributable [f]or each person you found caused or contributed to cause the *death*."[27]  Thus, when the jury apportioned fault between Marley and Adair, the jury could have considered Dr. Holland's testimony about the role the alcohol played in deciding whether its effects contributed to the collision or to Marley's Death if the jury decided to agree with Dr. Holland that the alcohol in Marley's system affected her faculties and her ability to exercise proper control over the judgments needed to exercise reasonable control over a car.[28] Even if the jury decided Marley couldn't

---

[26]Tex. Civ. Prac. & Rem. Code Ann. § 33.003.

[27]Emphasis added.

[28]*See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) (we measure the evidence against the court's charge, which submitted the proportionate fault question by asking the jury to determine each party's fault by asking the jury to find each person's percentage of responsibility for causing or contributing to *the death*, rather than by

have completely avoided the collision, the jury still had a right to consider Dr. Holland's testimony when deciding whether, if the jury agreed with Dr. Holland, Marley was more than 25% at fault for driving while she was impaired. Stated another way, the jury had a right to consider Dr. Holland's testimony in deciding what role the impairing substance played in causing or contributing to cause both the collision and Marley's death. We conclude the trial court abused its discretion by finding the evidence about Marley's use of alcohol wasn't relevant to the facts of consequence at issue in the trial.

2. *Was the evidence more probative than prejudicial?*

In a pretrial motion addressing Dr. Holland's report, the Plaintiffs argued that evidence that Marley had alcohol in her system and that she had been drinking the night before the wreck would be prejudicial because allowing the jury to consider the evidence would "conjure up prejudice about . . . alcohol, along with unsupported insinuations about

---

asking the jury to determine each person's percentage of responsibility for causing or contributing to cause *the harm* for which recovery of damages is sought); Tex. Civ. Prac. & Rem. Code Ann. § 33.003 (Determination of Percentage of Responsibility).

drunk driving (of which Marley is not guilty), and bias the jury against her." According to the Plaintiffs' pretrial motion, the probative value of the evidence was weak because the reduction in speed that would have resulted from a timelier application of Marley's brakes given the speed at which she impacted the trailer "hardly seems important."

In their response to the Plaintiffs' motion to exclude, Adair's attorney argued that at a blood-alcohol level of .05% (below that in Marley's system) the typical effects of alcohol include "a reduced coordination, reduced ability to track moving objects, difficulty steering, reduced response to [the] emergency driving situation, lowered alertness, [and] impaired judgment[.]" According to Adair, Dr. Holland's testimony was relevant to the issue of fault regardless of whether Marley couldn't have completely avoided the collision, and in addition, her speed at impact with the trailer would have been reduced had she reacted normally to the truck crossing the highway.

Before the trial, the trial court signed a pretrial order that prevented Adair from introducing Dr. Holland's testimony and the toxicology report into evidence. Under Texas Rule of Evidence 403, a trial court may "exclude relevant evidence if its probative value is

40

substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence."[29] Yet the evidence of another party's negligence is always "prejudicial" since in negligence cases, evidence of negligence is directly relevant to the plaintiff's claim or the opposing party's defense.

Thus, under our adversarial system, the proper inquiry is not whether the evidence is prejudicial, rather the question under Texas Rule of Evidence 403 is whether the evidence is *unfairly* prejudicial.[30] Within the context of Rule 403, unfair prejudice "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."[31]

At trial, the Plaintiffs claimed that the danger of unfair prejudice was high because the jury would view Marley as someone driving while intoxicated when that wasn't true. Yet as a matter of blackletter law, "a specific showing of intoxication is not required in order for evidence

---

[29]Tex. R. Evid. 403 (emphasis added).

[30]*Diamond Offshore Servs. v. Williams*, 542 S.W.3d 539, 549 (Tex. 2018) (emphasis added).

[31]*Id*.

regarding the use of substances to be admissible."[32] Although Marley's

blood-alcohol level was not above the .08 level that for purposes of the

Texas Penal Code creates a presumption the driver was driving under

the influence of alcohol, Dr. Holland's affidavit (and his report dated

August 22, 2017) tie Marley's BAC level of .055% to the collision and to

her loss of use of her normal use of faculties when the collision

occurred.[33] Moreover, even if the person's impairment from a substance

or combination of substances doesn't rise to a level of illegal

intoxication, evidence that shows a driver was impaired when offered to

explain why a driver was operating a vehicle in a manner relevant to a

wreck is admissible under Rule 403.[34]

---

[32]*JBS Carriers*, 564 S.W.3d at 838.

[33]*See* Tex. Penal Code Ann. § 49.01(2) (Defining "Intoxicated" as either "(A) not having the normal use of mental or physical faculties by reason of the introduction of alcohol . . . or (B) having an alcohol concentration of 0.08 or more"); *id*. § 49.04 (Driving While Intoxicated).

[34]*See e.g., Ticknor v. Doolan*, No. 14-05-00520-CV, 2006 Tex. App. LEXIS 6717, 2006 WL 2074721, at *2, 6 (Tex. App.—Houston [14th Dist.] July 27, 2006, pet. denied) (mem. op.); *Nichols*, 839 S.W.2d at 157-58; *Ford Motor Co. v. Whitt*, 81 S.W.2d 1032, 1037 (Tex. App.— Amarillo 1935, writ ref'd); *cf. Bedford v. Moore*, 166 S.W.3d 454, 465 (Tex. App.—Fort Worth 2005, no pet.).

Dr. Holland's affidavit and report tied the effect of a person having a blood alcohol level of more than .05% to a driver's "impaired response to emergency driving situations[.]" In his affidavit, Dr. Holland concluded that "to a reasonable degree of scientific certainty[,]" Marley "was impaired" while she was driving that morning and experienced "a reduced ability to take sudden and evasive action, such as slamming on the brakes in time to avoid the crash." Dr. Holland's statement about avoiding the crash is based on the report of Kelley Adamson, which explains that had Marley been traveling at the posted speed limit of 75 miles per hour when five seconds from the point of impact, she could have come to a complete stop had she engaged her brakes within a normal time.

The circumstances involved in the collision between Marley's car and the trailer Adair was towing required the jury to decide whether Marley acted with ordinary care. Dr. Holland's testimony is relevant to Marley's decision-making processes, and in our opinion, the excluded evidence would have allowed the jury to have additional evidence and an expert opinion to consider when assessing whether Marley's actions met the standard of ordinary care—that is, whether she was driving at

an excessive speed because her mental processes were impaired, whether her inattentiveness to her driving tasks related to the effects of the alcohol in her system, and whether she failed to slow her car down by letting off the gas or by hitting her brakes more quickly because her normal faculties were impaired by the effect of alcohol.[35] Deprived of evidence that allowed the jury to see the full picture, the Plaintiffs' attorney suggested the only thing that Marley did wrong was speed, an argument the jury apparently accepted by assigning Marley 25% of the fault.

According to the Plaintiffs, admitting evidence that Marley was impaired by alcohol would have been unduly prejudicial and misleading because the collision would have occurred regardless of whether Marley had made a timelier application of her brakes. We disagree with that argument for several reasons. First, we disagree because the jury had a right to consider how the alcohol affected Marley's judgment on how fast to drive. At trial, Kelley Adamson testified that Marley could have avoided the collision had she been driving "prudently" at the rate of 75

---

[35]*See JBS Carriers,* 564 S.W.3d at 839.

44

miles per hour. Thus, Dr. Holland's testimony that alcohol affects a person's judgment was highly probative on the issue that alcohol played a role in causing Marley's death by affecting the judgments that she made when she was driving her car.

Second, we disagree because Kelley Adamson (defendant's accident reconstruction expert) testified that in his opinion, Marley's "perception response [to the truck's entering the highway] was delayed by 1.1 second." While the Plaintiffs' expert on accident reconstruction (Benton Randle) testified in the Plaintiffs' case-in-chief that "[w]hatever her physical and mental capacities were, they were sufficient such that she was reacting timely." Adamson suggested the delay might be due to fatigue, but the trial court's ruling prevented Adair from arguing or emphasizing that the alcohol in Marley's system contributed to her delayed reactions or that she was impaired and her impairment, according to Dr. Holland, caused or contributed to Marley's death. Because the evidence that Marley's impairment from the alcohol in her system offers another explanation for her behavior during the seconds before the crash, it is evidence that would have provided the jury with "at least some view of" Marley's thought processes. Thus, the evidence

45

would have allowed the jury to evaluate the judgments Marley made when deciding whether she exercised ordinary care. We conclude the jury had a right to consider the evidence relevant to Marley's impairment from the alcohol in her system in assessing "whether her actions met the standard of ordinary care."[36]

Third, we disagree because the evidence the trial court excluded was not unnecessarily cumulative. To be sure, Kelley Adamson testified that fatigue could have adversely affected Marley's alertness and her ability to drive safely, but none of the three friends with whom Marley had spent the night testified that she was fatigued the morning she left for work.[37] Because the Plaintiffs obtained rulings from the trial court preventing Adair from presenting evidence that Marely had been

---

[36]*Id*. at 838.

[37]Of the three friends, Chelsie Miller testified that she went to sleep that night between 9:00 and 12 o'clock, and when she woke up at 6:00 a.m. on the morning of the wreck, she could hear talking or laughing from the room she was in, but that she "couldn't make out any of the words" since Marley was in another room. She said since she knew Marley had to go to work, she told Marley the night before she left for work that she should "get plenty of sleep[.]" Marley's boyfriend, Nana Yeboah, testified that on the night before the wreck, Marley went to bed at 10:00 o'clock. K.C. Joel testified that Marley went to sleep on the couch in the apartment he shared with Yeboah at midnight, and she woke up and went into a bedroom at the apartment at 2:00 a.m.

drinking with friends the night before the collision occurred, the jury wasn't allowed to consider that testimony in considering whether Marley was fatigued the morning she left her boyfriend's apartment to drive to work.

Fourth, in final argument, the attorney for the Plaintiffs capitalized on an evidentiary record that contained no evidence explaining Marley's conduct but that included evidence critical of Adair, including evidence that Adair argues was inadmissible on appeal.[38] For instance, in final argument, the attorney for the Plaintiffs acknowledged that Marley was speeding, but he also argued that "Marley's reaction time was perfectly normal." In closing argument, the Plaintiffs' attorney also argued that Adair's defense that Marley could have avoided the collision was frivolous. And he asserted that Adair's claim that Marley was seen with her head down by a passenger in one of the cars she passed was frivolous because when the passenger saw

---

[38]In issue four of the Appellant's brief, he argues the trial court erred in allowing the Plaintiffs' "safety/compliance expert to testify regarding various alleged violations of trucking regulations when the Chapla Parties' counsel and the expert each agree that the alleged violations did not cause the accident and that the alleged violations were not relevant to the legal and factual issues."

Marley, Marley was ducking her head in reaction to crashing into the trailer of Adair's truck.

We conclude the probative value of the evidence the trial court excluded is not substantially outweighed by the danger of unfair prejudice. The evidence about the alcohol isn't *unfairly* prejudicial because it doesn't have an undue tendency to suggest that the jury decide the case on an improper basis.[39] Here, because of the trial court's rulings excluding Dr. Holland's testimony and the toxicology report, the jury "heard only a limited, filtered version of the evidence" as the evidence relates to Marley's thought processes and judgments in driving a car.[40] Because the evidence was probative and relevant to the jury's decision regarding what percentage of fault to allocate to Marley in apportioning the fault between Adair and Marley for the wreck, we hold the trial court abused its discretion in excluding Dr. Holland's testimony and the toxicology report.[41]

---

[39]*Id.* at 839.

[40]*Id.* at 838.

[41]Tex. R. Evid. 403.

3. *Did excluding the evidence probably cause the rendition of an improper judgment?*

Having concluded the trial court abused its discretion in excluding the evidence about Marley's alcohol impairment, we must determine whether the error warrants reversal—that is, whether the error "probably caused the rendition of an improper judgment."[42] Under that standard,

> the complaining party [need not] prove that 'but for' the exclusion of evidence, a different judgment would necessarily have resulted. Rather, if erroneously excluded evidence was crucial to a key issue, then the error was likely harmful— that is, it probably caused the rendition of an improper judgment—unless the evidence was cumulative or the rest of the evidence was so one-sided that the error likely made no difference in the judgment.[43]

On this record, the following four reasons lead us to conclude that excluding Dr. Holland's testimony and the toxicology report probably caused the trial court to render an improper judgment. First, Dr. Holland's testimony and the toxicology report were not cumulative of other evidence admitted in the trial. No other evidence in the record

[42]Tex. R. App. P. 44.1(a)(1).
[43]*JBS Carriers*, 564 S.W.3d at 836 (cleaned up).

49

explains the role the alcohol in Marley's system may have played in causing her death.

Second, the evidence the trial court excluded was critical to key issues, specifically the role the alcohol in Marley's system may have played on her judgment in driving at 92.6 miles per hour and her perception and reaction to the hazard of the truck crossing the southbound lanes of U.S. 59. Insight into why Marley was driving her vehicle in the manner it was being driven when the collision occurred was critical to the jury's ability to evaluate her exercise of ordinary care.

Third, the evidence in the trial in large part focused on the percentage of fault that the jury should assign to Adair and Marley. Both attorneys conceded the evidence established that their clients were at fault—Marley for speeding and Adair for crossing the highway when he didn't have sufficient time to cross without impeding oncoming traffic.

Fourth, comparing Marley's negligence to Adair's required the jury to consider the relevant conduct of each of the parties in assessing the parties' comparative fault and assigning the responsibility of fault to each party for causing Marley's death. Without the benefit of Dr.

50

Holland's testimony and the toxicology report, the defendant couldn't argue that the alcohol was a vital piece of the puzzle and explained what caused or contributed to Marley's collision and her death. Whether Marley is 50% or more at fault for causing her death turns largely on whether she was an impaired driver and whether her decisions that morning as they relate to driving her car were impaired by the level of alcohol in her system the morning the wreck occurred. Yet even without that evidence, the jury found Marley 25% at fault. We conclude that the excluded evidence about Marley's use of a substance that impaired her ability to drive was important evidence that should have been presented to allow the jury to assess the parties' proportionate fault.

## Conclusion

We hold the trial court's erroneous exclusion of Dr. Holland's testimony and the toxicology report and evidence of impairment tied to the alcohol in Marley's blood probably caused the trial court to render an improper judgment.[44] We sustain Adair's first issue, reverse the trial

---

[44]Tex. R. App. P. 44.1(a).

court's judgment, and remand the case to the trial court for further proceedings consistent with the Court's opinion.

REVERSED AND REMANDED.


HOLLIS HORTON
Justice


Submitted on April 20, 2023
Opinion Delivered February 22, 2024

Before Horton, Johnson and Wright, JJ.